UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

NATURAL RESOURCES DEFENSE
COUNCIL, CENTER FOR
BIOLOGICAL DIVERSITY,
NATIONAL PARKS CONSERVATION
ASSOCIATION, CONSERVANCY OF
SOUTHWEST FLORIDA,
EARTHWORKS, and SOUTH FLORIDA
WILDLANDS ASSOCIATION,

        Plaintiffs,

v.                                  Case No: 2:16-cv-585-FtM-99CM

NATIONAL PARK SERVICE, RYAN
ZINKE, in his official
capacity as Secretary of the
U.S. Department of the
Interior, MICHAEL T.
REYNOLDS, in his official
capacity as Acting Director
of the National Park Service,
STAN AUSTIN, in his official
capacity as Regional Director
of the Southeast Region of
the National Park Service,
JIM KURTH, in his official
capacity as Acting Director
of the U.S. Fish and Wildlife
Service, and U.S. FISH AND
WILDLIFE SERVICE,[1]

        Defendants.

BURNETT OIL CO., INC., BARRON
COLLIER COMPANY LTD, COLLIER

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Ryan Zinke, the current
Secretary of the Interior, is automatically substituted for former
Secretary Sally Jewell. Acting Director of the National Park
Service Michael T. Reynolds is automatically substituted for
former Director Johnathan B. Jarvis. Acting Director of the U.S.
Fish and Wildlife Service Jim Kurth is automatically substituted
for former Director Daniel M. Ashe.

ENTERPRISES MGMT, INC., and
COLLIER RESOURCES COMPANY
LLP,

    Defendant-Intervenors.

---

**OPINION AND ORDER**

In this case, plaintiffs challenge the National Park Services' (NPS) approval of defendant-intervenor Burnett Oil Co., Inc.'s (Burnett) Plan of Operations (the "Plan") to conduct a three-dimensional seismic geophysical survey using vibroseis technology to identify whether there are commercially feasible deposits of oil and gas within the Big Cypress National Preserve in South Florida. Because plaintiffs believe that NPS approved the survey without undertaking the complete environmental review required by federal law, they filed a Complaint on July 27, 2016 (Doc. #1), and are currently proceeding on an eight-count Amended Complaint (Doc. #40), seeking declaratory and injunctive relief for violation of the Administrative Procedures Act (APA), the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), and Park Service Regulations governing oil and gas activities found at 36 CFR Subpart 9B (the "9B Regulations"). Plaintiffs request that the Court vacate and remand the NPS's finding of no significant impact, and its May 10, 2016 conditional approval letter for Burnett's Plan; vacate and remand the NPS's biological assessment and the Fish and Wildlife Service's (FWS)

concurrence letter for Burnett's Plan; and declare and order that the NPS and FWS are required to reinitiate consultation regarding the effects of Burnett's Plan and the three Preserve management plans on threatened and endangered species. (Doc. #94, p. 1.)

On September 30, 2016, plaintiffs filed a Motion for Preliminary Injunction (Doc. #36), requesting that the Court stay NPS's approval of operations pending a final adjudication on the merits of this case.[2] The federal defendants responded on November 9, 2016. (Doc. #56.) Defendant-intervenors Collier Enterprises Management, Inc.; Baron Collier Company Ltd.; Collier Resources Company, LLP (the "Collier Entities"); and Burnett responded on November 4, 2017. (Docs. ##52, 53.) On March 3, 2017, the undersigned heard oral argument on the preliminary injunction motion and the merits of plaintiffs' APA, NEPA, and 9B claims. (Doc. #87.) During oral argument, the parties informed the Court that they would rely on oral argument in support of the APA, NEPA, and 9B claims, without briefing, and requested to file briefs on the ESA claim[3] and available remedies, which was granted. The parties' cross-motions for summary judgment on plaintiffs' ESA claims and available remedies with responses were filed on March

---

[2] The preliminary injunction request is aimed solely at the National Park Service.

[3] The Complaint was amended on October 17, 2016 to add claims under the ESA. (Doc. #40.)

20, 2017, and April 3 and 10, 2017.  (Docs. ##94, 100, 102, and 105.)

For the reasons set forth below, judgment is entered in favor of the federal defendants on all claims.  Because the Court has found that defendants succeed on the merits, plaintiffs' Motion for Preliminary Injunction (Doc. #36) is denied.

## I. Background

### A. National Park System and the National Park Service Regulations

The national park system in the United States began with the establishment of Yellowstone National Park in 1872.  16 U.S.C. § 1a-1.  In 1916, the National Park Service Organic Act created the National Park Service within the Department of Interior.  16 U.S.C. § 1.  NPS was required to:

> promote and regulate the use of the Federal areas known as national parks, monuments, and reservations . . . as provided by law, by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

Id.  Thus, national parks are created with a conservation mandate, i.e., to conserve and preserve the scenery, wildlife, and objects (natural and historical) within their boundaries for present and future enjoyment.

Pursuant to the rulemaking provisions of the Organic Act, the Big Cypress Establishment Act, and the Addition Act, non-federal

oil and gas activities in the Preserve are governed by regulations codified at 36 C.F.R. Part 9, Subpart B (9B Regulations). The 9B Regulations govern "all activities within any unit of the National Park System in the exercise of rights to oil and gas not owned by the United States where access is on, across or through federally owned or controlled lands or waters." 36 C.F.R. § 9.30(a). They "are designed to insure that activities undertaken pursuant to these rights are conducted in a manner consistent with the purposes for which the National Park System and each unit thereof were created, to prevent or minimize damage to the environment and other resource values, and to insure to the extent feasible that all units of the National Park System are left unimpaired for the enjoyment of future generations." Id.

Park Service regulations require all proposed oil and gas plans of operations to include, as appropriate, a description of "[a]ll reasonable technologically feasible alternative methods of operations, their costs, and their environmental effects." 36 C.F.R. § 9.36(a)(16)(v). The agency "shall not approve a plan of operations" that "does not satisfy each of the requirements of § 9.36 applicable to the operations proposed." Id. § 9.37(a)(4). Park Service regulations also specify that the agency "shall not approve a plan of operations . . . [u]ntil the operator shows that the operations will be conducted in a manner which utilizes technologically feasible methods least damaging to the federally-

owned or controlled lands, waters and resources of the unit while assuring the protection of public health and safety."  36 C.F.R. § 9.37(a)-(a)(1).

**B. Big Cypress National Preserve**

   **(1)  Establishment Act and Ownership of the Preserve's Oil and Gas Resources**

   In 1974 Congress established the Big Cypress National Preserve (the Preserve) to "ensure the preservation, conservation, and protection of the natural, scenic, hydrologic, floral and faunal, and recreational values of the Big Cypress watershed in the State of Florida and to provide for enhancement and enjoyment thereof."  Pub. L. 93-440, § 1, 88 Stat. 1258 (Oct. 11, 1974), codified at 16 U.S.C. § 698f(a).  AR 166959; 166989 (map).[4]  The Secretary of the Interior (the Secretary) was authorized to acquire property within the Preserve, 16 U.S.C. § 698f(c), and required to administer the Preserve as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity in accordance with the provisions of sections 698f to 698m-4 of this title and with the provisions of sections 1, 2, 3, and 4 of this title, as amended and supplemented."  16 U.S.C.

_____

   [4] Two Administrative Records were filed in this case.  One was submitted on a thumb drive by the National Park Service (Doc. #46), the other by the U.S. Fish and Wildlife Service on a DVD-ROM (Doc. #68).  The NPS Administrative Record will be referred to as "AR" followed by the page number.  The FWS Administrative Record will be referred to as "FWS" followed by the page number.

§ 698i(a).  The original Preserve was over 574,000 acres, (variously estimated at 574,440 acres, AR 166987).  Approximately 147,000 acres were added in 1988 by the Big Cypress National Preserve Addition[5] (the Addition), PL 100-301; 74 Fed. Reg. 34030; 16 U.S.C. § 698m-1.  AR 166989.  The Preserve is centrally located between Miami and Naples, Florida, extending from the northern boundary of Everglades National Park to seven miles north of Interstate 75.  AR 166987.  Today, with the Addition, the Preserve covers approximately 729,000 acres.  AR 176892.

Congress instructed the Secretary to buy lands within specified boundaries to establish the Preserve, except that

> [n]o improved property . . . nor oil and gas rights, shall be acquired without the consent of the owner, unless the Secretary . . . determines that such property is subject to, or threatened with, uses which are, or would be, detrimental to the purposes of the preserve.

16 U.S.C. § 698f(c).  Because of this limitation on NPS's acquisition authority, when the United States acquired the surface lands of the Preserve it did not acquire most oil and gas rights.  AR 176896.  The surface and mineral estates were severed (a "split estate"), and private owners typically retained the mineral rights.  AR 000061.  Thus, the United States acquired most lands

---

[5] For purposes of this Opinion and Order, the term "Preserve" refers to Big Cypress National Preserve as a whole, including both the original preserve and the subsequent Addition lands, unless otherwise indicated.

of the Preserve from the Collier family, without associated mineral rights.  AR 176892.

Aware of this divided ownership of the surface estate and mineral rights, the Department of Interior explored purchasing a large portion of the Preserve's mineral interests from the Colliers in the early 2000s.  After substantial negotiations, the parties tentatively agreed to terms for a sale, contingent on Congressional appropriation of funds.  See Mathews Decl., Ex. 1 (Doc. #47-3). However, questions were raised regarding valuation of the deal, and the required funds were never appropriated.  See Mathews Decl., Ex. 2 (Doc. #47-3).  Accordingly, the vast majority of the Preserve's mineral estate remains in private ownership, including substantial mineral interests owned by the Collier Entities.[6]

**(2)  The Preserve's History of Oil and Gas Activity**

Oil and gas activities in the greater Big Cypress Swamp predates creation of the Preserve.  AR 001093.  Oil and gas activity has occurred in south Florida since 1930, and by the early

---

[6] Regardless of who owns the mineral rights, "federal law unambiguously displays congressional intent to empower the Park Service to regulate the [Big Cypress National Preserve]" in order to protect wildlife and visitors.  High Point, LLLP v. Nat'l Park Service, 850 F.3d 1185, 1198-99 (11th Cir. 2017).  The Preserve is part of the national park system, which the service promotes and regulates the use of, without mention of federal ownership. Id. (citing 16 U.S.C. § 3 (repealed 2014) (providing that the Secretary of the Interior "shall make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service")).

1970s, much of the area had seen drilling operations. AR 166990; 176892. The Sunniland Trend is part of the hydrocarbon-bearing South Florida Geologic Basin located beneath southwest Florida. AR 001093. The Sunniland Trend has produced over 120 million equivalent barrels of crude oil and non-commercial quantities of natural gas continuously since 1943 from commercial oil fields. Id.

Congress, aware of this oil and gas activity and the potential of the area for future exploration and production, prohibited the Secretary from condemning private oil and gas interests except in limited circumstances, 16 U.S.C. § 698f(c), but Congress also called for NPS to promulgate regulations governing "exploration for and extraction of oil, gas, and other minerals" in the Preserve. 16 U.S.C. § 698i(b)(2). Years later, in the Addition Act, Congress specified that the regulations should address

> access on, across, or through all lands within the boundaries of the Big Cypress National Preserve and the Addition for the purpose of conducting such exploration or development and production, as are necessary and appropriate to provide reasonable use and enjoyment of privately owned oil and gas interests, and consistent with the purposes for which the Big Cypress Preserve and the Addition were established.

Pub. L. No. 100-301 (S. 90), § 8, 102 Stat. 443 (1988). Throughout the Preserve's enabling legislation, Congress envisioned continued exploration and development of oil and gas, in a manner reasonably regulated by NPS and balanced with resource protection goals.

NPS addressed its multifaceted management authority in a 1992 General Management Plan (GMP) and final Environmental Impact Statement (EIS) for the original Preserve, which contained a Minerals Management Plan (MMP) and analyzed all phases of oil and gas activities, including seismic surveys, in the original Preserve.[7]  AR 166949-167412.  To protect resource values where oil and gas activities occurred, the MMP established a ten percent "area of influence" limit, "so that no more than 10 percent of the preserve would be influenced by [oil and gas] activities at any one time."[8]  AR 164184; 166970.

One form of such geophysical exploration is the seismic survey, a technique which has been used on the Preserve's lands since the early 1970s.  AR 176892; 174758.  Seismic surveys generate an energy "wave" that bounces off underground oil and gas deposits back up to small, strategically positioned sensors on the surface called "geophones."  AR 164284; 002351 (geophone).  The data acquired during the survey may be either two or three

---

[7] With regard to oil and gas activity in the Addition Lands, a 2011 Record of Decision only described how the Addition Lands are to be managed with respect to visitor access, ORV use, and wilderness.  Thus, oil and gas activities in the Addition lands are still managed in accordance with a separate 1988 agreement between the Collier entities and the United States, pending completion of a Preserve-wide oil and gas management plan.  (Doc. #40, ¶ 49.)  A Preserve-wide oil and gas management plan is currently in preparation by the National Park Service.  AR 172622.

[8] The area of influence for the Plan is 2.1%.  AR 164184.

dimensional, depending on the layout of the geophones and the location of the energy source points, but 3-D seismic surveys produce "better image[s] and successfully identify subtle geological features . . . ." AR 176907. The most common ways to create the energy wave necessary for a seismic survey are dynamite and vibration. The dynamite method, called "shot-hole drilling," requires drilling a grid of deep holes, dropping explosives into the holes, and detonating the charges. AR 178215; <u>see</u> AR 057514-18 (photographs of drilling equipment). The vibration method employs a specialized vehicle called a "vibroseis buggy,"[9] which lowers a hydraulic plate mounted to its undercarriage, vibrates it against the ground for 12-24 seconds, and moves to the next source location. AR 176911; 176909-10 (photographs of vibroseis buggies). A seismic survey maps the structural position of underground geological rock formations using sound waves, similar to an ultrasound examination, but does not penetrate the surface. AR 164284.

---

[9] The vibroseis buggies, which are the largest vehicles in the survey, have an articulation feature which allows them to maneuver in tight spots. AR 174783. They also are equipped with oversized balloon-type tires ("terra tires") to spread out the weight and minimize rutting, as recommended by the 2006 NPS Operators' Handbook. AR 171517; 176910 (pictures of terra tires). Vibroseis buggies have been used before in the Preserve and other parts of the National Park System, and were discussed in the 1992 GMP/EIS.

In 1999, the NPS issued an EA and FONSI for a 3-D seismic survey (the first in the Sunniland Oil Trend) conducted by Calumet Florida, Inc. in a 14-square mile area of the Preserve known as Raccoon Point. AR 170754. The seismic survey did not use vibroseis, but instead the older method of "shothole drilling," "mobilizing over 100 people, 15 off-road vehicles (swamp buggies and ATV's), eight rubber-tracked drill rigs, two heliportable drill rigs, and two helicopters . . . ." AR 170761. Follow-up monitoring confirmed that the survey had no long-lasting effects. See, e.g., AR 170752-67.

In 2000, NPS issued a second EIS and GMP for the lands of the Addition. AR 172579-173196. Both GMPs recognized that "recent discoveries of oil and gas both within and adjacent to the preserve have prompted interest in . . . geophysical exploration." AR 166990; 172610. In 2006, the NPS issued an "Operators Handbook for Nonfederal Oil and Gas Development in Units of the National Park System," which provides detailed discussions of the impacts of oil and gas activities and ways to minimize them. AR 171451-814.

**C. History of Burnett Oil's Oil and Gas Exploration Rights in the Preserve, Proposed Plan for 3-D Seismic Survey, and NPS's Consideration**

Because South Florida's Sunniland Trend is located hundreds of miles from the traditional oil developments in the southwestern United States, it took nearly a decade for the Collier Entities to

identify an exploration and development company with which to partner to explore their mineral resources. (Doc. #52-1, Affidavit of Tom Jones, VP for Govt. Affairs of the Barron Collier Companies, ¶ 17.) On April 3, 2013, Collier Resources Company and Burnett entered into a Seismic and Exploration Agreement establishing the terms for leasing of certain exploration rights for mineral interests owned by the Colliers within the Preserve.[10] Id. at ¶ 18. Pursuant to this arrangement, Burnett controls the exploration rights to certain Collier-owned oil and gas interests within the Preserve, and Burnett is responsible for obtaining the required permits and authorizations. Id. at ¶ 19.

In November 2013, representatives from Collier and Burnett informed NPS of their desire to conduct a seismic survey of Collier's private oil and gas resources in the Preserve. AR 000002. Burnett proposed to do this with vibroseis buggies to create seismic waves from the "source point", which bounce off underground rock formations and return signals back to the surface. The return signals are collected using small, portable receivers (geophones), which are placed on the ground by hand. By repeating this process across the survey area, Burnett is able to develop the three-dimensional imagery it needs to evaluate the potential

---

[10] On March 8, 2016, the parties entered into a letter agreement extending the Exploration Agreement due to prolonged permitting delays. (Doc. #52-1, ¶ 18.)

for oil and gas to have been trapped in structural formations two miles below the ground. See generally AR 176907-11. Burnett believes that the use of vibroseis buggies can generate better data with fewer source points, which means that the survey can be conducted with many fewer vehicles and in a fraction of the time required by the explosives method. AR 174782; 174830.

Initially, Burnett proposed a plan to NPS for a 3-D seismic survey covering roughly 400 square miles, to "be completed in V or VI phases." AR 000003. Phase I of the survey would focus on a 110 square mile area near a former Exxon exploratory oil field in the north-central part of the Preserve. Id. NPS staff cautioned that Burnett's "expectations of securing permits may be unrealistic" given the size of the survey area and their obligation to formally establish a right of entry on all parcels inside the survey area. AR 000005; see 36 C.F.R. § 9.36(a)(2). Nonetheless, in January 2014, Burnett submitted a plan of operations, pursuant to the NPS regulations for non-federal oil and gas activities on NPS-managed lands (9B Regulations). See 36 C.F.R. § 9.36. They sought approval for a 3-D seismic survey of 366 square miles (approximately half of the Preserve), using vibroseis buggies, stepped out in phases, the first phase encompassing approximately 110 square miles. AR 000012. NPS staff began to review that initial plan of operations. AR 000016-57; 261-69; 000313-30.

In June 2014, environmental consulting firm Passarella & Associates (Passarella) provided NPS a first draft EA, describing the anticipated impacts of the initial multi-phase plan. AR 000465. After reviewing that early-draft EA, NPS had concerns with its completeness, objectivity, and qualitative analyses. AR 001017; 001002-08. NPS provided Passarella comments, noting that it was "difficult if not impossible" to adequately analyze the impacts of later phases of the Plan, due to a lack of specific information about how the activities would be conducted. AR 001039-52; 001042.

In August 2014, Passarella informed NPS on behalf of Burnett that the Plan would be revised to simplify the multi-phase concept, reduce the total survey area by 75%, and seek approval for Phase I only.[11] AR 001070. A new Plan, covering only a 110-square mile focal point (approximately 70,454 acres) of the original Plan, was submitted in September 2014.[12] AR 001071-1908. Over the next several months, NPS coordinated with the applicants and their consultants to refine both the Plan and the draft EA. AR 002255-88 (response to NPS comments); AR 002364-2991 (Oct. 2014 draft);

---

[11] Phase I is the only phase that is the subject of this lawsuit.

[12] Seventy-five percent of the revised survey area is the Original Preserve, while 25% is the Addition Lands. See FWS 003668; 005728 (map).

AR 003648-4490 (Dec. 2014 draft); AR 003012-13 (NPS comments, Nov. 2014).

Early in 2015, Burnett offered to show NPS how the vibroseis buggies proposed in their Plan would operate in the Preserve's environment. Burnett requested temporary access to an area of the Preserve near Interstate 75 for this purpose. AR 004559-60. NPS approved the request, and representatives of Burnett, its geophysical contractor, and NPS met for the vibroseis demonstration on April 22, 2015. AR 004644; 004647. NPS recorded several hours of video during the demonstration, and later prepared a summary report.[13] AR 164894-900. Although the demonstration had certain adverse impacts, like tire rutting, damage to several cypress trees, and "mashed down" vegetation, AR 164896-97, NPS expected that the vegetation "will likely recover in a few months," and found that the soil rutting was generally "not significant . . . ." AR 164897. NPS further stated that "there was no appreciable effect on the ground" where the vibrator plate had been deployed. Id. Although the vibroseis buggy became stuck

_____

[13] Video from the demonstration is included in the "data" folder of the Administrative Record and still images from the demonstration were displayed at the hearing. Burnett demonstrated the maneuverability of the buggy and full vibration "sweeps." Early in the day, the vibroseis buggy became stuck in a man-made ditch, but Burnett explained that "under normal circumstances an accompanying vibroseis buggy would have pulled the buggy free," since the approved plan calls for buggies to travel in groups of three. AR 164896.

once, the report noted that NPS could "work with the applicant to identify various habitats in the project area that must be avoided . . . and areas where the proposed equipment may be able to be used." AR 164898; see also AR 057455 (showing offset vibration points).

In June 2015, NPS informed Passarella and Burnett that the Plan was complete, consistent with federal regulations, and that NPS would begin its formal public review process to evaluate the Plan. AR 004720. NPS requested public comments on Burnett's revised Plan, AR 004768, considered the comments received, and provided Burnett additional input on the released Plan and in-progress EA. AR 057208.

In the ensuing months, NPS made revisions to Passarella's draft EA to ensure it comported with NPS standards. AR 057207-08; see, e.g., AR 054878-55071 (redlined EA); 055514-55708 (same); 055911-56106 (same). In addition, NPS reviewed before and after photographs of the vibroseis demonstration site, which were provided by Burnett. AR 054851-62 (photographic report); 054843-48 (aerial photographs); AR 054807-16 (ground-level photographs). Burnett argues that these images revealed that six months after the demonstration, vegetation and soils impacted by the vibroseis buggy had largely recovered.

On November 20, 2015, NPS released the first public EA for Burnett's Plan. The EA evaluated three alternatives: 1. a no-

action alternative; 2. seismic survey using vibroseis buggies; and 3. seismic survey using explosives. AR 176907-17. Although NEPA does not require an opportunity for public comment on an EA, see 40 C.F.R. 1501.4(b), NPS requested comments and held a public information meeting. AR 176654-863 (EA released Nov. 2015); 057198 (press release); 057493-501 (public meeting presentation slides); AR 057624-26 (flyer). NPS received over 65,000 public comments, some expressing concerns with the seismic survey. Based on the comments received, Burnett proposed modifications to the Plan and worked with NPS to make changes to the proposed action, including relocating all staging activity outside Preserve boundaries to an existing industrial site called Vulcan Mine. Previously, staging areas were at five locations throughout the Preserve, covering approximately 11.5 acres. AR 057730-36; 093139; 093552-66 (staging area review PowerPoint prepared by Burnett).

These changes necessitated preparation of a revised EA and draft Wetlands Statement of Findings. On March 25, 2016, NPS released a revised EA. AR 176887-177089. Again, despite the fact that NEPA does not mandate public comment periods for EAs, NPS requested further public comments related to "scientific or technical information that would aid in the agency reaching a decision on a revised [EA]," through April 9, 2016. AR 095035-36.

NPS responded to public comments on both drafts of the EA, including those opposed to the survey.[14]  AR 164214-24; 177075-87. NPS noted that the vibroseis buggies would have "similar but lesser impacts" than recreational ORVs due to their "wide, balloon-type tires, spreading the ground pressure over a large area."  AR 164221.  The survey vehicles would use existing trails where possible and would seldom travel the same routes more than once, due to the survey's "one pass" design, whereby a vehicle group would not normally travel the same route more than once.  AR 164253.  Although some commenters expressed concern that the survey could have lasting impacts, citing survey lines from the 1970s which are still visible in places, NPS explained that seismic exploration was unrestricted in those days: "bulldozers were allowed to plow paths across the landscape" to provide faster access for shot-hole drilling.  AR 164220.  NPS also noted that the total "footprint" of vegetation and soils affected by vibroseis buggy travel would be less than 1.16 square miles of the 110 square mile survey area.  AR 164224.  Importantly, NPS reinforced that "47 explicit mitigation measures are incorporated into the selected alternative," to "prevent lasting impacts," "minimize

[14] The March 2016 revised EA is the final EA for purposes of this Opinion and Order.  AR 176887-177089.  Any changes due to responses to public comment after March 2016 are described in the appendices to the March 2016 EA.  AR 164180-81.

short-term impacts," and "ensure that no significant adverse impacts occur." AR 164223.

The EA incorporates by reference three prior NPS NEPA analyses that address management of oil and gas activities and the use of ORVs within the Preserve, AR 164201-02, including a series of environmentally-protective measures identified in the NPS' 1992 GMP/EIS and the 2006 Operators Handbook. AR 174759; 174764; 174837; 174839. The EA also incorporates by reference two prior ORV analyses. First, in 2000, NPS adopted the Big Cypress National Preserve Recreational ORV Management Plan/EIS, which governs the use of ORVs in the Preserve. AR 169310-928. Second, in 2010, NPS finalized the Big Cypress National Preserve Addition Final GMP/Wilderness Study/ORV Management Plan/EIS ("2010 Addition GMP/EIS"), which addresses management of the Addition, including ORV activities.[15] AR 172579-3196.

_____

[15] The National Park Service's allowance of motorized recreational ORVs in the *original Preserve* has been a contested and litigated subject since at least 1995. The history and resolution of the resulting litigation concerning the 2000 General Management Plan can be found at Defenders of Wildlife v. Salazar, 877 F. Supp. 2d 1271 (M.D. Fla. 2012). The history and resolution of litigation concerning the *2010 Addition GMP/EIS* can be found at Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior, 46 F. Supp. 3d 1254 (M.D. Fla. 2014), aff'd, 835 F.3d 1377 (11th Cir. 2016). Plaintiffs argue that the concerns pertaining to the adverse effects of ORVs also apply to off-road seismic operations that will occur in this case.

Such reliance on a previous EIS is specifically authorized. See 40 C.F.R. § 1502.20.

**D. ESA Consultation Regarding the Plan**

For purposes of ESA consultation, NPS provided FWS a biological assessment (BA) in February 2014 that had been prepared by Passarella. FWS 003929. In response to comments received from FWS, NPS issued a revised BA in November 2014, FWS 004928, assessing the effects of Burnett's Plan on eleven federally-listed or candidate species, including two plants. AR 179693-94; 179720-50.

The revised BA concluded that the planned survey is "not likely to adversely affect" ESA-listed species including the threatened American alligator, threatened eastern indigo snake, threatened Audubon's crested caracara, endangered Everglade snail kite, endangered red-cockaded woodpecker, threatened wood stork, endangered Florida bonneted bat, and the endangered Florida panther. FWS 006623-27. The revised BA also concluded that the planned survey is "not likely to adversely affect" the gopher tortoise, Florida prairie-clover, or Florida pineland crabgrass, all of which are ESA "candidate" species. FWS 006628. Finally, the revised BA concluded that the planned survey may affect the Florida panther but that it would have "little, if any adverse consequences on this species, and any such consequences would be insignificant." FWS 005003-04. In addition to the revised BA, NPS provided FWS the December 2014 draft EA, FWS 005074, and the December 2014 revised plan of operations, FWS 005706.

On February 25, 2015, FWS issued a letter concurring that the survey is not likely to adversely affect any of the species considered in the BA. FWS 006622. As to the Florida bonneted bat, FWS reasoned that the survey lines would be scouted daily in an attempt to identify and avoid potential nesting or roosting sites. FWS 006626-27. In addition, FWS reasoned that temporary loss of vegetation during the establishment of transect lines and buggy access paths will not significantly affect foraging opportunities. Id. Finally, FWS concluded that potential roosting sites will not be affected because trees with a diameter greater than 10.2 centimeters will not be removed. FWS 006627. By its own terms, the February 25, 2015 letter completed consultation only for "the seismic survey as specifically described in the project description" and stated that reinitiation of consultation may be required "[i]f modifications are made to the project." AR 004592-93.

FWS clarified and affirmed its "not likely to adversely affect" determination with regard to the Florida bonneted bat and other species, following receipt of a notice concerning plaintiffs' intent to bring ESA claims, see FWS 007001, in a memorandum to file dated September 6, 2016. FWS 007017. FWS stated that because the planned survey is a short-term activity (completed in 18 weeks), with limited spatial extent (approximately 70,000 acres with 2.5 square miles affected per

day), any action-caused avoidance behaviors by listed species would be only an insignificant effect. Id. at 007019.

In November 2015, NPS requested to reinitiate informal consultation on the draft EA for Burnett's Plan. AR 057226. The FWS responded that "unless the project changes," its concurrence was valid, and that it could not assess an alternative to the Plan without a BA for the alternative. FWS 006741. In March 2016, NPS notified the FWS of the revised EA and stated that the five staging areas in the Preserve were eliminated. AR 095040. The FWS found that the elimination of the five staging areas did not affect its concurrence. FWS 006999.

The revised EA for Burnett's Plan incorporated by reference three Preserve management plans: (1) 1992 Big Cypress National Preserve General Management Plan/Final Environmental Impact Statement for the Original Preserve, which included a Minerals Management Plan; (2) 2000 Big Cypress National Preserve Recreational Off-Road Vehicle Management Plan/EIS for the Original Preserve; and (3) 2010 Big Cypress National Preserve Recreational Off-Road Vehicle Management Plan/EIS for the Addition. With regard to ESA consultation, in 1991, the FWS found that the Preserve GMP may adversely affect Florida panthers and did not permit any incidental take. AR 167380-85. In 2000, the FWS evaluated effects of the ORV Plan on seven species, AR 169868-914, and concluded that it was likely to adversely affect the Florida

panther because panthers will "move away from designated [ORV] trails," which "could alter normal breeding, feeding, and sheltering behavior." AR 169900. The FWS authorized incidental take of Florida panthers through harassment by ORVs and required the NPS to restrict ORVs to designated trails. AR 169904-05.

In 2010, the FWS evaluated effects of the Addition GMP on seven species, AR 174088-174, and concluded that it was likely to adversely affect the Florida panther, largely due to effects from opening ORV trails. AR 174099; 174126-33. The FWS authorized incidental take of Florida panthers through harassment, principally due to panthers avoiding ORV trails. AR 174136-37. The Addition GMP and the associated biological opinion were reviewed and upheld by this Court in National Parks Conservation Ass'n v. U.S. Dep't of Interior, 46 F. Supp. 3d 1254 (M.D. Fla. 2014), adhered to on reconsid. 2015 WL 476163 (M.D. Fla. Feb. 05, 2015), aff'd 835 F.3d 1377 (11th Cir. 2016).

Plaintiffs commented to the Agencies on the effects of Burnett's Plan on listed species in April 2014, FWS 004045-53; December 2014, FWS 006549-85; August 2015, AR 4976, 4994-99; December 2015, AR 084576, 084607-36; and April 2016, AR 095316, 095358-90.

## E. NPS's Final Decision (FONSI)

On May 6, 2016, NPS issued a Finding of No Significant Impact (FONSI) for the EA, selecting Alternative 2 — Burnett's revised

plan of operations using vibroseis technology, as modified by forty-seven total minimization and mitigation measures[16] which would apply as conditions of approval. AR 164179-282 (FONSI); AR 164184-92 (list of 47 mitigation measures); AR 164123-24 (press release). The FONSI concluded that with standard operating procedures, best management practices, and mandatory minimization and mitigation measures, the selected action "will not significantly affect the quality of the human environment." AR 164179. The agency concluded that the effects of the vibroseis buggies and other off-road vehicles would be "similar to impacts from past recreational ORV use," but concluded that there were important differences which would make the survey less impacting such as the use of terra tires, operation during the dry season, immediate restoration of any damage, and the use of existing trails. AR 164193. "Based on the impact analysis in the EA, the impacts described above would occur in only a small portion of the survey area (0.01% of the survey area), which comprises approximately 0.001% of the Preserve." AR 164207. And "[d]ue to the low intensity, short-term nature of the impacts and the

---

[16] Among those measures are provisions that the survey will only be conducted in the dry season (when soils are more resilient), AR 174754; crews will be accompanied by expert ecologists and archeologists to identify and avoid sensitive areas, AR 174753; and clean-up and restoration crews will work concurrently with survey operations, AR 174764-67. Also, the "one pass design" will be utilized to minimize soil and vegetative impacts caused by repeated traffic. AR 174764.

required minimization and mitigation measures, affected resources will return to a condition similar to those that currently exist within three years or less, in most cases." Id.

The NPS also addressed the April 2015 vibroseis buggy demonstration, and noted that the field test had "demonstrated minimal vegetation impacts and substantial recovery six months later." AR 164193-94. The primary problem with the demonstration was that the buggy got stuck in a man-made ditch, and the NPS concluded that the "[i]f the field test had followed the same minimization and mitigation measures (e.g., No. 46) that will be in place for the selected action, Preserve staff would have rerouted the vehicle around the area such that it would not have followed the original route and subsequently gotten stuck." AR 164197.

The FONSI discussed the three prior, incorporated Preserve Management Plans, AR 164194-96, finding that the recreational ORV use addressed in the management plans involved repeated passes over the same locations (which causes greater impact), whereas Burnett designed its survey to minimize the number of times that vehicle cross the same location (the "one pass" survey design), AR 177032, and Burnett's survey incorporates environmentally-protective measures that are not required for general recreational ORV activities.

**F. The Two Phases of Burnett's Approved Seismic Survey**

The approved seismic survey will be conducted in two main phases, both of which plaintiffs take issue with. See Declaration of Charles E. Nagel III (Doc. #53-2). The first phase involves scouting out the locations of the source and receiver points[17] and placement of geophones (the "Preliminary Survey Phase"). AR 164183-84. In this first phase, survey crews will enter the survey area with NPS personnel and other qualified specialists and identify routes for vibroseis buggies to follow and areas to avoid, consistent with NPS mitigation measure 46 that "[n]o Vibroseis operations will be undertaken without prior NPS approval of proposed routes." AR 164192; see also Condition 6 of the mitigation measures (NPS involvement in field operations), Conditions 15 and 30 (scouting team includes wetland scientist, archeologist, and ecologist). This work will be done by personnel working on foot and using vehicles. Vehicles in the initial phase will include pickup trucks (on-road only), utility transport vehicles ("UTV's") (small off-road vehicles which are smaller than recreational swamp buggies, photos at AR 174809), a trailer (to be used on roads only), and a helicopter. No vibroseis buggies will be used during the Preliminary Survey Phase. Burnett estimates that the Preliminary Survey Phase will take approximately six weeks. (Doc. #53-2, ¶ 10.)

---

[17] See AR 174990-94 (maps of source and receiver points).

The second phase (the "Seismic Acquisition") involves the actual data acquisition, which is when the vibroseis buggies will be used for approximately six weeks. During this phase, vibroseis buggies will enter from mile marker 63 on Interstate 75, following the routes identified in the Preliminary Survey Phase. A group of three buggies will be accompanied by two UTVs, which include a scout UTV working with a professional wetland scientist and archeologist (in a second UTV).[18] The buggies will stop for approximately two minutes at each vibration source point and apply approximately 12 to 24 seconds of vibration at each source point. AR 164184. Adding additional time to transition between the different phases, mobilize, and clean up, Burnett believes it will need approximately four months to complete the approved seismic survey.[19] AR 164183.

---

[18] Plaintiffs state in their brief that the vibroseis buggies will be preceded and accompanied by ORVs in the second phase, yet the record shows that they will be accompanied by UTVs in the second phase. See AR 164253.

[19] Condition 1 of the forty-seven minimization and mitigation measures provides that the survey will be conducted during dry season conditions to minimize potential environmental effects of operating survey vehicles. AR 164184-85. Prior to oral argument, NPS had not yet given notice to Burnett that conditions were sufficiently dry for the survey to proceed. On March 10, 2017, NPS informed Burnett that "conditions favorable for the preliminary phase of your approved seismic survey to begin will be met by March 22, 2017." (Doc. #89-1.) Thus, Burnett has provided notice that it intended to start the preliminary phrase of the survey on March 27, 2017, and the second phase on April 19, 2017. (Doc. #89, ¶ 3.)

## II. The Administrative Procedures Act

Each of the eight counts in the Amended Complaint sets forth claims under the Administrative Procedures Act (APA) and a federal statute or regulation. The Court begins by discussing the general principles of the APA, and then discusses each of the individual counts.

Under the APA, a court may set aside an agency's actions, findings, or conclusions only if they are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2). This is an exceedingly deferential standard in which "[t]he court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008) (citation omitted). An agency action may be found arbitrary and capricious "where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Defenders of Wildlife v. United States Dep't of the Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) (citation omitted).

This standard of review provides a court with the least latitude in finding grounds for reversal, and allows setting aside administrative decisions only "for substantial procedural or substantive reasons as mandated by statute, not simply because the court is unhappy with the result reached." Citizens for Smart Growth v. Sec'y of the Dep't of Transp., 669 F.3d 1203, 1210 (11th Cir. 2012) (quoting Fund for Animals v. Rice, 85 F.3d 535, 541-42 (11th Cir. 1996)). A court must "defer to the agency's technical expertise," City of Oxford v. FAA, 428 F.3d 1346, 1352 (11th Cir. 2005) (citation omitted), because when it "is making predictions, within its area of special expertise, at the frontiers of science . . . as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." Defenders of Wildlife v. Bureau of Ocean Energy Mgmt., 684 F.3d 1242, 1248-48 (11th Cir. 2012) (quoting Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009)). This deferential standard applies even in the context of summary judgment. Preserve Endangered Areas of Cobb's History v. United States Army Corps of Eng'rs, 87 F.3d 1242, 1246 (11th Cir. 1996). Plaintiffs bear the burden to show agency action is arbitrary and capricious. Druid Hills Civic Ass'n v. Fed. Highway Admin., 772 F.2d 700, 709 n.9 (11th Cir. 1985); Citizens for Smart Growth, 669 F.3d at 1211.

A reviewing court must consider whether the record contains substantial evidence in support of an agency decision. 5 U.S.C.

§ 706(2)(E).  Substantial evidence is "'relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion.'"  Stone & Webster Constr., Inc. v. U.S. Dep't of Labor, 684 F.3d 1127, 1133 (11th Cir. 2012) (quoting Richardson v. Perales, 402 U.S. 389 (1971)).  This standard precludes a reviewing court from "deciding the facts anew, making credibility determinations, or re-weighing the evidence." Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam).  "The ability to find adequate support in the record for a contrary conclusion is insufficient to overturn an agency's factual conclusion." Natl. Parks Conservation Ass'n, 835 F.3d at 1384 (citing DeKalb Cty. v. U.S. Dep't of Labor, 812 F.3d 1015, 1020 (11th Cir. 2016)).

### III. The Four APA and NEPA Claims (Counts I-IV)

Plaintiffs allege that NPS violated NEPA and the APA by failing to: (1) prepare an Environmental Impact Statement for Burnett Oil's Plan of operations (Count I); (2) take a "hard look" at the effectiveness of the mitigation measures required for Burnett Oil's Plan of Operations (Count II); (3) take a "hard look" at the adverse impacts caused by implementation of all aspects of Burnett's Plan, including all direct, indirect, and cumulative impacts on Preserve resources (Count III);  and (4) consider all reasonable alternatives to Burnett Oil's Plan of Operation (Count IV).

## A. NEPA General Principles

The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370, established a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States.  42 U.S.C. § 4321.  NEPA does not itself mandate particular results, but only imposes "procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions."  Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 757-58 (2004); see also Citizens for Smart Growth, 669 F.3d at 1211; Van Antwerp, 526 F.3d at 1360.  NEPA compliance must take place *before* decisions are made in order to ensure that those decisions take environmental consequences into account.  Wilderness Watch v. Mainella, 375 F.3d 1085, 1096 (11th Cir. 2004) (emphasis in original).

"NEPA essentially forces federal agencies to document the potential environmental impacts of significant decisions before they are made, thereby ensuring that environmental issues are considered by the agency and that important information is made available to the larger audience that may help to make the decision or will be affected by it."  Id. at 1094 (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)).  "NEPA

ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989). The Council on Environmental Quality (CEQ), an agency created by NEPA in the Executive Office of the President, has issued regulations to guide agencies' compliance. 40 C.F.R. §§ 1500.1-1508.28.

To comply with NEPA, agencies often prepare an Environmental Assessment (EA), a "concise" public document which "briefly" discusses the environmental impacts of, and alternatives to, a proposal for federal action. 40 C.F.R. § 1508.9. Agencies may use the EA to determine whether the proposed action will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.3-1501.4. If the proposed action will have "significant" environmental impacts, NEPA instructs agencies to prepare an Environmental Impact Statement (EIS), a detailed environmental review document which analyzes the environmental impacts of the proposal, reasonable alternatives, and other factors. 42 U.S.C. § 4332(2)(C). If, however, the agency prepares an EA and concludes that the proposed action is not likely to have significant impacts, the agency may issue a Finding of No Significant Impact (FONSI), and the NEPA process is complete. 40 C.F.R. § 1508.13. A FONSI is a factual determination which "implicates substantial agency expertise and is entitled to deference." Marsh, 490 U.S. at 376.

Because NEPA imposes purely procedural requirements, rather than substantive results, and does not mandate any specific outcome, "agencies may make a decision that preferences other factors over environmental concerns as long as they have first adequately identified and analyzed the environmental impacts." Citizens for Smart Growth, 669 F.3d at 1211 (citing Van Antwerp, 526 F.3d at 1361). If the agency follows the process required by NEPA in deciding whether to take the action, even a capricious substantive decision will not violate NEPA because "NEPA merely prohibits uninformed - rather than unwise - agency action." Van Antwerp, 526 F.3d at 1361-62 (quoting Robertson, 490 U.S. at 350-51 (footnote omitted)). Agency decisions allegedly violating NEPA are reviewed under the APA's highly deferential standard. Citizens for Smart Growth, 669 F.3d at 1203.

**B. The Alleged NEPA Violations**[20]

**(1) "Hard Look" at Adverse Impacts (Count III)**

Plaintiffs allege that NPS failed to take a "hard look" at the adverse impacts of Burnett Oil's Plan in three ways: (1) In the revised EA and FONSI, NPS failed to evaluate the cumulative impacts of all four phases of Burnett's planned seismic exploration, which all are "reasonably foreseeable," see 40 C.F.R.

---

[20] The Court will not consider the Counts in numeric order, but rather will consider them in an order that makes the most sense given the allegations.

§ 1508.7; (2) NPS failed to evaluate the cumulative impacts of eleven other projects affecting wildlife and habitat in the same region; and (3) NPS failed to consider numerous direct impacts from the Plan.  The Court will consider each argument in turn.

### (a)  Cumulative Impact of Four Phases

As discussed above, Burnett initially submitted a proposal for a 3-D seismic survey covering roughly 400 square miles, to "be completed in V or VI phases."  Phase I of the survey would focus on a 110 square mile area near a former Exxon exploratory oil field, and the initial plan requested approval for all four phases. AR 000003.  Because the details of such a multi-phase project were quite unclear, Burnett's Plan was revised to request approval for only one phase.  AR 176893.

Plaintiffs argue that Burnett has stated that approval for the future phases will be requested under a separate plan for each subsequent phase, and that Burnett has acquired mineral exploration rights for these future phases.  Thus, plaintiffs reason that because the future phases are "reasonably foreseeable," NPS should have, but failed to, consider the cumulative impact that would result from the four phases.  Burnett responds with the Declaration of its President, Charles Nagel III, who states that while Burnett reserves the right to submit future plans of operation, it has no plan to file an application for any

future plans of the seismic survey.  <u>See</u> Doc. #53 at 11; Doc. #53-2, ¶ 14.

In the NEPA context, the reviewing court must ensure that the agency took a "hard look" at the environmental consequences of the project.  <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 295 F.3d 1209, 1216 (11th Cir. 2002).  A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  This requirement prevents a proponent from breaking a proposal into small pieces that, when viewed individually, appear insignificant but that are significant when viewed as a whole.  40 C.F.R. § 1508.27(b)(7) ("Significance cannot be avoided by terming an action temporary or breaking it down into small component parts.").

CEQ regulations do not define "reasonably foreseeable," but cases interpreting that phrase have recognized that the impacts of a future project cannot be meaningfully analyzed until there is some degree of certainty about the scope of the project and specific actions proposed.  <u>City of Oxford v. FAA</u>, 428 F.3d 1346, 1353 (11th Cir. 2005) (proposal must be "sufficiently concrete for the agency to gather information useful to itself and the public").  The inquiry into whether a future action is foreseeable should be

conducted with an eye toward the purposes underlying NEPA.  NEPA
contains an implicit "rule of reason," "which ensures that agencies
determine whether and to what extent to prepare an EIS based on
the usefulness of any new potential information to the
decisionmaking process."  Dep't of Transp. v. Public Citizen, 541
U.S. 752, 767 (2004).

    In City of Oxford, the Eleventh Circuit found that a
cumulative impact analysis is not required for hypothetical plans.
In that case, a highway widening was not in the planning stages.
"With no concrete plan to consider . . . investigators and
researchers would be forced to analyze the environmental impact of
a project, the parameters and specifics of which would be a mere
guess."  428 F.3d at 1355.  See also Envtl. Prot. Info. Ctr. v.
U.S. Forest Serv., 451 F.3d 1005, 1014-15 (9th Cir. 2006) (Where
the "parameters of the . . . project were unknown at the time of
the EA, it was not arbitrary and capricious for [the agency] to
omit the project from its cumulative analysis.")

    Here, NPS noted that the revised plan

    seeks approval only for what was identified as the first
    phase (110± square mile survey area) of the originally
    proposed NG3-D Seismic Survey (Figure 1-1).  [Burnett]
    is no longer seeking approval for Phases II, III, and IV
    that were identified in the original [Plan of
    Operations].  Those phases are no longer part of the
    [Plan of Operations], and the NPS will only evaluate
    what is requested in the [Plan of Operations].

AR 176893.  The NPS concluded that the "probability or extent of any future surveys is speculative" and that any remaining phases "are not reasonably foreseeable . . . and therefore are appropriately not included in the cumulative impact analysis."  AR 177076; see also AR 164214, 164219.  In comments on the multi-phase plan, NPS explained that

> Approval of Phases II, III, and IV would be subject to Burnett submitting additional information prior to conduct of operations in the later phases . . .  While such an approach could provide checkpoints for Burnett and the NPS to benefit from lessons learned in prior phases, approving a plan of operations under this scenario may be difficult if not impossible given that impact analysis expectations . . . may not be met. . . . Where information is lacking, an alternative may be to scale back operations to include areas where information is available and adequate cumulative impact analysis can be conducted.

AR 001041-42.

The Court finds that there is insufficient evidence that the next three phases of Burnett's Plan will ever occur to justify a requirement that NPS assess their cumulative impact.  When Burnett reduced the size of the proposed survey area to only 25% of its original size (AR 001069-70), it stated that it was "no longer seeking approval for Phases II, III, and IV that were originally identified in the original POP," and that "[t]hose phases are no longer part of the POP."  AR 003668.  The data collected in the approved survey may well affect if and/or where Burnett will seek to conduct future survey activities in the Preserve, including

whether pursuing oil and gas in the Preserve is economically feasible. Even if Burnett intends to conduct more surveys, plans for those phases are not concrete enough to allow NPS to meaningfully analyze their cumulative environmental impacts. See City of Oxford, 428 F.3d at 1356 n.23 (if a new building is proposed, the agency "may then be required to analyze the cumulative impacts of that project in conjunction with the project currently at issue."). The Court finds no NEPA or APA violations.

**(b) Cumulative Impacts of Eleven Other Projects**

Plaintiffs next argue that NPS failed to evaluate the cumulative impacts of other projects affecting wildlife and habitat in the same region, including a seismic survey approved for 161 square miles of private and state lands just north of the Preserve (the "Tocala Survey"), and at least eleven major development projects proposed in the habitat for endangered Florida panthers and other species. Plaintiffs assert that these projects will put increased pressure on the single population of Florida panthers and on other wildlife that use the Preserve, and should have been included in NPS's cumulative impact analysis of the Plan.

Defendants respond that plaintiffs have waived this argument because they failed to mention these other projects in their comments on the October 2015 EA (AR 057230-320). The Court finds this argument unpersuasive as plaintiffs did raise this argument

in the second comment period.  See AR 057348; 057366-67; 057370-73.  But even if the argument was not waived, the federal defendants argue that NPS's decision was not arbitrary and capricious as the record reveals that NPS did consider and address the other projects, and NPS was within its discretion to decline to consider the cumulative impacts.

"Cumulative environmental impacts are, indeed, what require a comprehensive impact statement.  But determination of the extent and effect of these factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies."  Kleppe v. Sierra Club, 427 U.S. 390, 413-14 (1976).  Here, regarding the seismic survey on private and state lands north of the Preserve, NPS explained that "[t]he Tocala survey is miles from the Preserve, is on privately owned ranchland, has no effects on Preserve resources, and thus should not be included in the cumulative impacts analysis."  AR 094221.  The record also shows that NPS did address the other projects, but NPS declined to consider their cumulative impact because those projects would not affect the same resources as the proposed action.  AR 164219.  In this regard, NPS stated that "many projects listed by commenters were located one or more counties away from the survey area, and these projects would not affect the same resources as the proposed action and therefore would not be considered under cumulative impacts."  AR 164219.  Plaintiffs have

not shown that NPS's decision was arbitrary and capricious as it was well within NPS's expertise to determine that the other projects would not have a cumulative impact. The Court finds no NEPA or APA violation.

**(c)  Direct Impacts from the Plan**

Plaintiffs complain that during the agency's preparation of the revised EA, Burnett decided to use an off-site staging area at an existing industrial site (Vulcan Mine) outside the Preserve, over eight miles from the seismic survey area, instead of five on-site staging areas.[21]  Plaintiffs argue that in approving the off-site staging area, NPS failed to consider how the increased helicopter flight time would affect wildlife and visitor experiences in the areas between the off-site staging area and the seismic survey area, as well as off-road travel of survey vehicles such as ORVs, besides the vibroseis buggies, to ferry supplies back and forth.  Defendants respond that NPS did take a hard look at each of these impact topics.  The Court agrees with defendants.

With regard to the off-site staging area being moved to the Vulcan Mine site, it is worth noting that plaintiffs requested that NPS move the staging area out of the wetlands in the Preserve. AR 004977; 004987-88.  The initial EA described five "staging

_____

[21] The federal defendants again argue that plaintiffs have waived the staging area argument because it was not raised until the second comment period.  This argument again fails for the above reasons.

areas" where crew would assemble and vibroseis equipment, support trailers, helicopter landing zones, and other miscellaneous survey infrastructure would be located. AR 176680-81; AR 093533 (example photograph staging area). NPS noted the possibility that "a high-density, interlocking, composite mat system" might be installed at the staging areas, to protect the underlying soil and root system of vegetation. AR 176811. NPS considered the effects of having staging areas in Preserve wetlands, AR 176680-81, and determined after public comment that moving staging areas out of the Preserve to the Vulcan Mine site[22] would in fact "significantly reduce environmental impacts" and "reduce environmental impacts, personnel, and vehicular traffic, as well as eliminate the use of heavy equipment in the Preserve." AR 094063; 094056-57 (map); 176910-11 (final EA). This modification eliminated the use of composite mats.

With regard to the impact of off-road vehicles other than vibroseis buggies, the EA did specifically consider the impacts of these vehicles. AR 002342 (photograph of UTV). The EA describes how "survey activities would generally utilize a 'one pass' design," which "means that the equipment group (which would include a UTV and three Vibroseis buggies) would seek to traverse a given area only once, and that area would not be driven upon repeatedly

---

[22] See AR 093530 (aerial image of Vulcan Mine site).

again in the majority of cases." AR 176919. NPS also explained how minimization and mitigation measures would reduce any vehicular impacts to wetlands, habitat, soils, and vegetation to minimal levels. AR 176973. Thus, NPS noted that the "one-pass" design of the survey, the fact that operations would be limited the dry season, and other minimization and mitigation measures would reduce the impacts of all motorized vehicles used in the survey.

NPS also took into account the impacts support vehicles would have on wilderness. AR 176987 (discussing effects "of Vibroseis buggies, UTVs, helicopters, and other mechanized equipment"). In the Wetlands Statement of Findings, attached as Appendix B to the EA, NPS explained how the equipment groups would work:

> [e]ach group of buggies will have a scout UTV working with a professional wetland scientist and archeologist (in a second UTV), traveling in tandem across vibration source point lines with the least environmental impacts. . . . The "one pass" design eliminates the progressive widening of trails which generally occurs as a result of overuse and rutting from multiple passes. Virtually all of the one pass lanes had restored in one year and completely disappeared after seven years of recovery.

AR 177032. NPS cited studies which concluded that "single passes of ORVs (in most cases) did not result in long-term adverse impacts to vegetation or soils" and "virtually all of the one pass lanes had restored in one year and completely disappeared after seven years of recovery." Id. The NPS noted that vibroseis buggies have similar but lesser impacts to recreational ORVs, and soil

impacts would be temporary or minimal because they would use existing trails when possible, soil ruts would be immediately restored, among other factors.  AR 177078.

Regarding visitor experience and recreation, NPS explained that the original five staging areas "would have been located near I-75 recreational access points," but after moving the staging location outside the Preserve, "[n]o survey activities would occur within a half-mile of campgrounds, interpretive sites, research sites, or other publicly funded facilities, as the five staging areas would not be used."  AR 094226.

A review of the record belies plaintiffs' assertion that NPS summarily concluded that the Vulcan Mine site would have lesser impacts than the on-site staging areas.  See Van Antwerp, 526 F.3d at 1360 (agency not required to redo environmental analysis for minimization measure that are within the scope of studied impacts). The Court finds no NEPA or APA violation.

**(2)  Viable, Less-Damaging Alternatives to the Plan (Count IV)**

Plaintiffs contend that NPS adopted an impermissibly narrow purpose and need statement which led to its failure to consider all reasonable, less damaging alternatives to the Plan.  The federal defendants respond that the Court should defer to the purpose and need statement that NPS properly formulated based on Burnett's interest as the survey applicant, as well as NPS's resource management interests.

**(a) Purpose and Need Statement**

Here, NPS's final definition of the project's purpose was consideration of Burnett's "request to exercise its private oil and gas exploration rights while protecting the Preserve resources." AR 176895. "The proposed geophysical exploration is needed to determine whether and where potentially producing geological structures might be located so that owners of those oil and gas interests may exercise their private property rights." Id. Plaintiffs believe that this purpose and need statement is too narrow and was biased towards approval from the beginning.

An EA must include "brief discussions of the need for the proposal [and] of alternatives as required by [NEPA]." 40 C.F.R. § 1508.9(b); 42 U.S.C. § 4332(2)(E). "[A]gencies must look hard at the factors relevant to the definition of purpose" and "should take into account the needs and goals of the parties involved in the application." Citizens for Smart Growth, 669 F.3d at 1212 (quoting Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991)). "[A]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." Id. "Nor may an agency frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish those goals and

the project would collapse under the weight of the possibilities."
Id.  When responding to applications from private actors, agencies
"should take into account the needs and goals of the parties
involved in the application" when formulating a statement of
purpose and need.  Citizens for Smart Growth, 669 F.3d at 1212
(quoting Citizens Against Burlington, 938 F.2d at 199).

Over the course of nearly two years, NPS supplemented and
revised the EA, in consultation with Burnett and in response to
public comments.  The statement of purpose and need was revised
as well.  Compare AR 468 (first draft) with AR 176895 (final).
The statement properly considers NPS's goals — to consider and act
on Burnett's survey proposal, "while protecting the Preserve
resources," AR 176895, but it also identifies Burnett's objective
as the applicant to investigate the nature and extent of private
mineral rights, which is permissible under Eleventh Circuit
precedent.  The Court finds that the record establishes that NPS
complied with APA and NEPA in this regard.

**(b)  Consideration of Less Damaging Alternatives**

NEPA does not impose any minimum number of alternatives that
must be evaluated.  See N. Buckhead Civic Ass'n v. Skinner, 903
F.2d 1533, 1541-43 (11th Cir. 1990) (finding that an EIS with only
two alternatives studied in detail was sufficient); Tongass
Conservation Soc'y v. Cheney, 924 F.2d 1137, 1140-42 (D.C. Cir.
1991) (finding that agency complied with NEPA when thirteen of

fourteen alternatives were eliminated as unreasonable and only one alternative was discussed in detail in the EIS). "Agencies only have to consider reasonable alternatives, and we evaluate their choices against a rule of reason." Citizens for Smart Growth, 669 F.3d at 1212. The "obligation to consider alternatives under an EA is a lesser one than under an EIS." Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1246 (9th Cir. 2005); see also Sierra Club v. U.S. Army Corps of Eng'rs, 464 F. Supp. 2d 1171, 1227 (M.D. Fla. 2006) (collecting cases).

Here, NPS considered ten alternatives in total, and three of those alternatives in detail – 1. a no-action alternative[23]; 2. seismic survey using vibroseis buggies; and 3. seismic survey using explosives. See AR 176907-17 (describing alternatives 1, 2, and 3); AR 176917-18 (describing alternatives A-G that were considered but dismissed).

First, NPS analyzed the "no action" alternative (Alternative 1), whereby NPS would not approve the plan of operations, "and current activities and management would continue in the Preserve." AR 176907. During scoping, NPS noted that this alternative would not achieve Burnett's need to survey its mineral resources, "and likely would result in a taking of [Burnett] and Collier mineral property rights." AR 002355. Second, NPS considered the proposed

---

[23] The "no action" alternative basically means that NPS would consider leaving everything as-is, with no seismic survey.

action: a "Seismic Survey Using Vibroseis Buggies," similar to the Plan submitted by Burnett. AR 176907-11. Third, NPS analyzed the alternative previously used for surveys in the Preserve: "Seismic Survey Using Explosive Charges," which employs dynamite buried in drill holes as the energy source for a seismic survey. AR 176915-17. NPS stated that from an environmental impact view, vibroseis is better because additional impacts would occur from the act of drilling the seismic shot holes. AR 004662. In addition to the three alternatives analyzed in detail, NPS considered and dismissed seven alternatives which were infeasible, substantially similar to alternatives already examined, or did not meet the purpose and need for action. AR 176917-18 (dismissed alternatives A-G).

Plaintiffs specifically argue that NPS should have further analyzed "the option of purchasing or trading to acquire the private mineral rights" underlying the Preserve (dismissed alternative G). (Doc. #36 at 28.) The EA describes this "purchase or trade" alternative, and NPS dismissed it from detailed consideration "because it would not meet the project purpose and need and is equivalent to the No Action alternative in terms of impacts." AR 176918.

The Court finds that NPS reasonably concluded that pursuing a purchase or trade for the mineral rights would not meet the applicant's need for action: surveying the private minerals that

are there.  *See* <u>Citizens for Smart Growth</u>, 669 F.3d at 1212.
Furthermore, as discussed above, the Department of Interior had
already explored at length the possibility of acquiring the Collier
mineral estate, which fell apart without Congressional approval.
Therefore, the Court finds that NPS's failure to consider this
alternative in detail was not unreasonable.

Plaintiffs other arguments regarding NPS's failure to
consider potentially less-damaging survey alternatives are also
unavailing.  These dismissed alternatives include the use of
smaller, more maneuverable vibroseis equipment; use of handheld
equipment; conditionally approving partial access; and
alternatives that would reduce or avoid surface occupancy of the
Preserve altogether via use of aerial surveys. (Doc. #36 at 18-
19.)

The EA specifically mentions these alternatives.  The
"Reduced Survey Area" alternative was dismissed because "the
required data would not be obtained" and the alternative would not
meet the project purpose and need — especially when "[t]he proposed
action already represents a scaled-down version of [Burnett's]
original survey area," by roughly seventy-five percent.  AR
176918.  NPS also considered the "No Surface Occupancy"
alternative, which would have used "less invasive techniques
including aeromagnetic and gravity surveys," but dismissed these
possibilities because they are "used to conceptualize large

regions but are not suited for determining precise drilling locations, except in areas of salt domes." AR 176917-18; 177084. This alternative, too, would not meet the applicant's need of acquiring the relevant mineral data. Finally, Burnett and NPS discussed the possibility of using smaller vibroseis buggies, but Burnett ultimately elected to use equipment it was more familiar operating, which was accepted by the NPS. AR 004665; 004870. And although plaintiffs make much of the fact that the gross vehicle weight of the vibroseis buggies is in excess of 17,000 pounds, the buggies will utilize "balloon" or "flotation"-type tires to substantially reduce the weight on the surface to 26 pounds per square inch. AR 164182. These terra tires will also result in less potential impact to plant roots due to the lack of tread. Id.

When alternatives are rejected from consideration in an EIS, there is no duty to perform in-depth analyses of these alternatives. 40 C.F.R. § 1502.14(a) (stating that agencies shall "[r]igorously explore and objectively evaluate all reasonable alternatives," but when alternatives have been rejected from consideration, agencies need only "*briefly* discuss the reasons for their having been eliminated" (emphasis added)). Here, there is nothing demonstrating that NPS's choice to exclude an in-depth analysis of the rejected alternatives was inappropriate, as a brief discussion is all that NEPA requires. NPS discussed in the EA the

various alternatives, fulfilling NEPA'S requirement to "briefly" discuss the rejected alternatives. The Court finds that the NPS's actions were not arbitrary or capricious, and did not violate the APA or NEPA.

### (3) "Hard Look" at Minimization and Mitigation Measures (Count II)

Plaintiffs argue that NPS violated NEPA and the APA by failing to take a "hard look" at the forty-seven mitigation measures, rendering the measures "useless." Plaintiffs argue that the mitigation measures are not supported nor studied by NPS to see if they will be effective, and there is no backstop in the event the mitigation measures do not work as their effectiveness is based upon subjective criteria at NPS personnel's open-ended discretion.

When an agency "relies on mitigation measures to offset the adverse impacts of an action," its analysis "must reflect that a 'hard look' was taken . . . at the mitigation measures relied on." Nat'l Parks Conserv. Ass'n, 46 F. Supp. 3d at 1321. An analysis "that simply states mitigation measures without evaluating their effectiveness is useless in assessing whether adverse impacts would in fact likely be mitigated." Id.

A finding of no significant impact based upon mitigation measures is permissible. "When mitigation measures compensate for otherwise adverse environmental impacts, the threshold level of 'significant impacts' is not reached so no EIS is required."

C.A.R.E. Now, Inc. v. F.A.A., 844 F.2d 1569, 1575 (11th Cir. 1988) (concluding that the utility of NEPA was apparent in that case as without NEPA the agency would not likely have imposed mitigations as conditions for completion of the project). Mitigation measures must be "more than a possibility" for an agency to rely upon them in a FONSI. Sierra Club, 464 F. Supp. 2d at 1224–25, aff'd, 508 F.3d 1332 (11th Cir. 2007) (quoting Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs, 351 F. Supp. 2d 1232, 1250 (D. Wyo. 2005)). First, the measures must be a condition of approval or otherwise integrated into the proposed action. Id. Second, there must be support for the agency's conclusion that the mitigation measures will create "an adequate buffer so as to render such impacts so minor as to not warrant an EIS." Id. See also C.A.R.E. Now, 844 F.3d at 1575 (courts "must" consider mitigation measures where "they were imposed as conditions of the agency action").

Here, the EA sets forth 47 measures to mitigate the effect of the survey which "will apply as conditions of approval" and "as an additional assurance that the impacts of the selected action will be lessened and will not be significant." AR 164179-80; see generally AR 164184-92. The 47 minimization and mitigation measures are incorporated as mandatory components of the selected action. AR 164179 (all minimization and mitigation measures "will apply as conditions of approval").

The mitigation measures at issue raised by plaintiffs in their brief on the preliminary injunction (Doc. #36) and at oral argument include the requirement that Burnett decompact soils and restore ruts, depressions, and vehicle tracks with rakes "to original contour conditions concurrent with daily operations using shovels and rakes to prevent the creation of new trails"[24]; avoid soft soils and standing waters[25]; and operating in "dry season conditions"[26]. (Doc. #36 at 20-21.)  The Court will examine each in turn.

**(a)  Soil Restoration**

With regard to the use of shovels and rakes to restore rutted soil, NPS explained in the Wetland Statement of Findings that "[a] similar restoration protocol was followed with regard to the 1999 3-D seismic survey at Raccoon Point," where mitigation included

> restoration of ruts and vehicle tracks resulting from seismic operations to original contour conditions. Restoration and monitoring of nine locations showed vegetation restoration "success" in all locations after three years.  "Success" in areas deemed to be disturbed

---

[24] Restoring "[r]uts, depressions, and vehicle tracks resulting from field operations . . . to original contour conditions concurrent with daily operations using shovels and rakes to prevent the creation of new trails."  AR 164187 (measure 18).

[25] "Avoid[ing] hydrological impacts by re-routing seismic survey activities around soft soils and standing water areas, thereby reducing the risk for rutting and subsequent channelization."  AR 164185 (measure 7).

[26] Conducting the survey only in dry season conditions, "to avoid disturbance to wetland areas with visible standing water or saturated soil conditions."  AR 164184-85 (measure 1).

> by seismic survey activities was defined as when "the achievement of recruited percent coverage meets or exceed 80 percent of the undisturbed adjacent percent coverage" (WilsonMiller, Inc. 2000).

AR 164258.  See also AR 170347-67 (noting that after one year, four of nine disturbed areas at Raccoon Point "had recovered sufficiently [to] where they could not be identified in the field").  Although plaintiffs and their consultants expressed the opinion that restoration of soil conditions would not work, see, e.g., AR 163750, NPS considered these opposing views and found them unpersuasive.  In this regard, NPS staff noted that plaintiffs' consultant provided "no indication that [he] has visited the site," and "no acknowledgement of past successful NPS restorations following oil and gas activities."  AR 164122.  Based on its own experience with this technique in the Preserve, NPS reasonably concluded that restoration of soil conditions would be an effective way to mitigate soil and hydrology impacts from survey vehicles.  Defendants submitted the Declaration of Don Hargrove, an Environmental Protection Specialist for NPS, who reiterated that the use of hand tools to restore vehicle ruts to the original contour conditions is a technique that has been used successfully in previous geophysical survey projects within the Preserve. (Doc. #47-1, ¶ 18.)

Hargrove also states that mitigation measure number 22 in the FONSI further requires that "soils will be decompacted and returned

to match the original grade." (Doc. #47-1, ¶ 18.) Elevations will be determined from adjacent, undisturbed seasonal wetlands. This is how NPS routinely determines the proper elevation for trail stabilization to ensure that vehicle tracks will not affect sheet flow. Therefore, pre- and post-impact topographic surveys are unnecessary. (Id.) Thus, NPS provided adequate support for the effectiveness of such a mitigation measure, which satisfies the "hard look" requirement of NEPA.

**(b) Avoidance of Soft Soils**

With regard to the measure that vehicles must avoid soft soils, Appendix B to the EA provides that

> [s]eismic survey vehicles will avoid operations in standing water or soils saturated at or just below the surface to significantly decrease the likelihood of soil and plant disruption. In addition, if the vehicle tires begin to break the soil surface, the Operator will retreat and move around the soft soils.

AR 164253. The EA then explains that "NPS would be consulted to determine access to off-trail source points in environmentally sensitive areas." AR 176918. And "[n]o Vibroseis operations will be undertaken without prior NPS approval of proposed routes." AR 176923. Indeed the EA contemplates that "NPS staff and inspectors will be heavily involved throughout field operations." AR 164187. NPS personnel will help identify impacted areas, direct restoration activities, and oversee monitoring efforts. (Doc. #47-1, ¶¶ 18, 22; AR 164192. NPS has provided adequate support

for its assertion that this mitigation measure will lessen the environmental impacts based upon the agency's experience. NPS has satisfied the "hard look" requirement of NEPA.

**(c)   Dry Season Conditions**

Finally, plaintiffs argue that the mitigation measure limiting survey operations to "dry season conditions" when soils and vegetation are more resilient to vehicular activity will be ineffective because the EA does not explicitly define a measureable threshold for when "dry season conditions" exist or otherwise define the time period adequately. In this regard, the EA explains:

> [t]he period from November through mid-May is considered the dry season, although in any given year the dry season could begin and/or end earlier or later than these dates. In general, the water table across the site is at the surface during the wet season and within a few feet below the ground surface during the dry season. During the dry season, there is typically standing water only in the deepest portions of the wetlands.

AR 176958-59. NPS elaborated in responses to comments that "[m]itigation measure #1 further restricts the survey to dry season conditions, so as not to allow the survey to occur during those months even if conditions are wetter than normal." AR 164222. See also AR 093679-80 (email from NPS staff explaining factors relevant to the Preserve's dry season).

Defendants argue that a specific date range for the dry season is not required as NEPA allows for adaptive management to

continually review and evaluate soil conditions. "NEPA specifically allows agencies to utilize adaptive management plans that . . . monitor the real environmental effects of a project and allow the [agency] to adapt its mitigation measures in response to trends observed" — i.e., the levels of precipitation and saturation in the Preserve. W. Watersheds Project v. Bureau of Land Mgmt., No. 3-11-cv53-HDM-VPC, 2011 WL 1630789, at *3 (D. Nev. Apr. 28, 2011); see Nat'l Park Conservation Ass'n, 46 F. Supp. 3d at 1279 (affirming adaptive management planning for ORV use in the Preserve).

There is support in the record for NPS's conclusion that the operations will occur in the dry season and may rely on its own expertise in making technical determinations such as when conditions in the Preserve will be ideal for operations. See Marsh, 490 U.S. at 377-78 ("Because analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies" which may rely on the reasonable opinions of its own qualified experts.); AR 093679 (NPS personnel responding to public comment regarding the dry season, noting that there is variability when the dry season occurs, generally occurring Nov. 1 to mid-May). NEPA allows NPS the flexibility to make on-site determinations regarding when conditions are dry enough for operations. How wet the soil is on a day-to-day basis is something

that generally would not lend itself to precise definition, as plaintiffs propose. Thus, the Court cannot say that the agency decision in this regard was arbitrary or capricious. NPS took a sufficient "hard look" under NEPA.

**(4) Failure to Prepare an EIS (Count I)**

Plaintiffs argue that NPS's FONSI and decision to forego an EIS for the Burnett Plan failed to meet the four requirements set forth in Hill v. Boy. Hill v. Boy states that "in determining whether an agency's decision not to prepare an EIS is arbitrary and capricious," courts consider four criteria: (1) "'the agency must have accurately identified the relevant environmental concern'"; (2) "'once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA'"; (3) "'if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding'"; and (4) "'if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.'" Hill, 144 F.3d at 1450 (quoting Coal. on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 66-67 (D.C. Cir. 1987)).

An agency initially must determine whether the action to be taken constitutes a "major federal action" – that is, an action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.18. If the agency determines

that a proposed activity is a "major federal action," the agency must prepare a detailed statement, the EIS.  Id.  When it is unclear whether a proposed activity is a "major federal action" requiring an EIS, the agency typically prepares a shorter, preliminary statement – an EA.  Highway J. Citizens Grp. v. Mineta, 349 F.3d 938, 953 (7th Cir. 2003).  An EA is a "rough-cut, low-budget EIS" which is mandated when a proposed action is neither one normally requiring an EIS nor one categorically excluded from the EIS process.  Id.; 40 C.F.R. §§ 1501.4; 1508.9.  Among other information, the EA "provide[s] evidence and analysis that establish[es] whether or not an EIS or a Finding of No Significant Impact ('FONSI') should be prepared."  Id.  If the agency determines that a proposed activity is not a "major federal action," it must produce a FONSI, which is a document "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment."  40 C.F.R. § 1508.13.  Whether an action will have significant impacts is a factual determination which "implicates substantial agency expertise" and is entitled to deference.  Marsh, 490 U.S. at 376.  The task for a reviewing court is to determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29,

43 (1983) (quoting <u>Burlington Truck Lines v. United States</u>, 371 U.S. 156, 168 (1962)). NEPA regulations describe ten factors that agencies should consider in evaluating the intensity of impacts, 40 C.F.R. § 1508.27(b)(1)-(10), which are also set forth in the CEQ regulations.

Here, plaintiffs argue that at least five of the intensity factors indicate that the Plan is a "major federal action", warranting an EIS: (1) there will be impacts to "[u]nique characteristics of the geographic area," including "park lands," "wetlands," and "ecologically sensitive areas," 40 C.F.R. § 1508.27(b)(3); (2) the effects of the Plan are "highly controversial" (as shown by plaintiffs' expert reports), <u>Id.</u> § 1508.27(b)(4); 43 C.F.R. § 46.30 (defining "[c]ontroversial"); (3) as the first phase of a planned four-phase seismic survey, the approval of the Plan "may establish a precedent for future actions with significant effects," 40 C.F.R. § 1508.27(b)(6); (4) the Plan is likely to "adversely affect an endangered or threatened species," <u>Id.</u> § 1508.27(b)(9); and (5) the action "is related to other actions with individually insignificant but cumulatively significant impacts," <u>Id.</u> § 1508.27(b)(7). Plaintiffs further argue that NPS improperly relied on vague, untested, and unlikely-to-succeed mitigation measures to avoid preparing an EIS. Defendants respond that an EIS is only required if the action will cause significant impacts to these areas, which the NPS properly

concluded would not occur here.[27]  The Court will consider each argument in turn.

### (a)  Parklands, Wetlands, and Ecologically Sensitive Areas

Plaintiffs first assert that an EIS was required due to the "[u]nique characteristics of the geographic area," such as "parklands," "wetlands," and "ecologically sensitive areas" within the meaning of section 1508.27(b)(3).  NPS concluded that the anticipated adverse impacts to water quality, hydrology, and subsurface geologic resources were expected to be localized and short-term, likely within one growing season, similar to the impacts from recreational ORV use analyzed in the 1992 GMP/EIS, 2000 ORV Plan, and the 2010 Addition GMP/EIS.  AR 164195.  "All potential impacts to water quality, hydrology, and subsurface geologic resources are addressed by the plan design and/or mitigation measures (Minimization and Mitigation Measures Nos. 1, 7, 11, 18, 23, and 26) and would be avoided to a large extent by conducting work during the dry season."  AR 164196.

Additionally, vegetation; habitat; soils; protected plants; hydrology; subsurface geological resources; and wetlands were impact topics selected for analysis in the EA.  AR 176899-900.

---

[27] It is worth noting that the NPS has already prepared three Environmental Impact Statements related to the impacts of oil and gas and/or ORVs in the Preserve, which were incorporated by reference into the EA here.  AR 176891.

With regard to wetlands, the FONSI for the EA included a Wetland Statement of Findings ("Wetland Statement"). AR 164225-64. After discussions with the NPS, a review of existing soil surveys, vegetation mapping, and aerial photographs, it was determined that a significant majority of the seismic survey area consisted of wetlands, thus, the report was prepared. AR 164234. The Wetland Statement determined that there would be no permanent loss or degradation of wetland function, only temporary adverse impacts. AR 164250. And any impacts would be substantially reduced by the minimization and mitigation measures. AR 164251. The Wetland Statement also extensively discussed the minimization of potential vegetation, hydrologic, and geologic impacts, concluding that because compensatory mitigation was proposed for "unavoidable wetland impacts," the project was in compliance with Director's Order 77-1 and Executive Order 11990, "Protection of Wetlands." AR 164264.

As required by Hill v. Boy, once an environmental concern is identified, the NPS is only required to take a "hard look" at the problem. In this case, the survey design requires preliminary scouting using GIS data and in-field scouts to help survey crews avoid sensitive areas, all of which were examined and discussed in the Wetland Statement. AR 164186. Furthermore, "[u]se of motorized vehicles will be avoided in [Important Resource Areas] and other sensitive resource areas within the Preserve identified

by NPS," and NPS will review and approve all proposed routes before vibroseis field operations occur. AR 164183; 164187; 164192. Based upon a review of the record, the impacts in these areas were identified and reviewed by NPS which reasonably found that the impacts on parklands and wetlands not to be significant enough to warrant an EIS. NPS did take the "hard look" in compliance with the APA and NEPA.

**(b) Effects of the Plan are Highly Controversial**

Plaintiffs next assert that an EIS was required because the Plan is "highly controversial" as over 65,000 public comments were submitted. The FONSI did address these concerns, stating that

> for NEPA *controversial* refers to circumstances where a substantial dispute exists as to the environmental consequences of the proposed action and does not refer to the existence of opposition to a proposed action, the effect of which is relatively undisputed (43 CFR 46.30). While the NPS notes there is opposition to the proposed action, there is no substantial dispute concerning the effects of the proposed action.

AR 164216 (emphasis in original). NPS further stated that it understands that there is opposition, but

> the NPS did not find any information in the comment letters or attachments that would give rise to a substantial controversy over the environmental impacts of the selected action. The NPS reviewed the two reports that were submitted, one from Quest Ecology and one from McVoy, and did not find that new information was provided that would demonstrate a controversy over impacts. It does not appear that the scientists who prepared the reports visited the site or are familiar with the site and history of the Preserve. Conclusions in the Quest report claim severe impacts without any basis provided in the report. The NPS disagrees with

the conclusions, which exaggerate the potential for exotic plant introduction, erroneously asserts that dredge and fill permits will be required, and makes speculative predictions concerning impacts that have not been observed with years of off-road vehicle (ORV) use at the Preserve. The McVoy report fails to consider the successful NPS restorations following oil and gas activities and does not include information that would give rise to a substantial controversy over impacts.

AR 164216.

The "highly controversial" significance factor is triggered only when there is "a substantial dispute about the size, nature or effect of a federal action" — not merely "the existence of opposition to a use." Ga. River Network v. U.S. Army Corps of Eng'rs, 334 F. Supp. 2d 1329, 1338 (N.D. Ga. 2003). "Many courts have found 'something more' to be scientific or other evidence that reveals flaws in the methods or data relied upon by the agency in reaching its conclusions." Id. "These cases teach that even the submission of declarations "from numerous experts who claim [] that [a project] will have significant adverse impacts on [an area] ... alone fail[s] to rise to the level of 'controversy' under NEPA." Id. (quoting Sierra Club v. Van Antwerp, 719 F. Supp. 2d 58, 67-68 (D. D.C. 2010) aff'd in part, rev'd in part on other grounds, 661 F.3d 1147 (D.C. Cir. 2011), as amended (Jan. 30, 2012); but cf. Humane Soc'y of U.S. v. Dep't of Commerce, 432 F. Supp. 2d 4, 19-20 (D. D.C. 2006) (finding agencies' decision not to prepare an EIS to be highly controversial based on comments

from the plaintiff and other agencies indicating their disagreement with the agencies' conclusions).

Here, NPS reasonably found that "there is no substantial dispute concerning the effects of the proposed action." AR 164216. Plaintiffs have not identified any underlying flaws in NPS's analysis of the impacts from the Plan, and opposition alone is not enough to require that an EIS be performed. Thus, the Plan was not a highly controversial project that required preparation of an EIS under NEPA.

### (c) Precedent for Future Actions

Third, plaintiffs argue that approval of the Plan "may establish a precedent for future actions with significant effects" because Burnett plans to seek approval for additional phases. 40 C.F.R. § 1508.27(b)(6). The Court finds no basis in the record for this assertion. Responding to public comments, NPS explained that it would independently "evaluate any requests for future exploration, which at this point are speculative, and determine the appropriate NEPA pathway at that time." AR 177076. In correspondence with Burnett months before the EA was complete, NPS specifically declined to rely on past seismic-survey FONSIs to prematurely justify a FONSI for Burnett's proposal. See AR 048633-34. Accordingly, there is no indication that this action is precedential in a way that will bind NPS to preparing EAs rather

than EISs in the future, or to automatically approve future seismic survey proposals.

**(d) Adverse Effects on Endangered or Threatened Species**

Next, plaintiffs assert that the Plan is likely to "adversely affect an endangered or threatened species," 40 C.F.R. § 1508.27(b)(9), because the EA concluded that "[s]hort-term adverse impacts to protected wildlife and other wildlife resources . . . are expected." AR 164195. Plaintiffs brief does not explain how these impacts will rise to the level of significance which would require an EIS, which is more fully discussed in the context of the ESA claims, below.

The EA describes how Burnett's survey could result in wildlife "avoidance behaviors" and "short-term stress during their breeding season," but notes that mortality and injury to wildlife is "not anticipated." AR 176975. Further, the approved survey includes a multitude of minimization and mitigation measures aimed at protecting wildlife — for example, creating minimum buffers around listed species and wading birds; imposing seasonal restrictions on survey activities; and requiring wildlife training for survey crews.

**(e) Cumulative Impacts & Mitigation Measures**

Plaintiffs again raise a cumulative impacts argument, asserting that significant impacts exist (and an EIS is required) if an action "is related to other actions with individually

insignificant but cumulatively significant impacts." 40 C.F.R. §
1508.27(b)(7). Plaintiffs reiterate that that NPS failed to take
a hard look at all four phases of the Plan and ignored other
activities and developments in the region, thereby illegally
avoiding a finding of significant impacts. Plaintiffs further
argue that NPS improperly relied on vague, untested, and unlikely-
to-succeed mitigation measures to avoid preparing an EIS.

As discussed above, the Court has found that NPS took a "hard
look" at the cumulative impacts and mitigation measures and was
reasonable in finding no significant impacts from the survey. The
Court finds that the NPS's actions were not arbitrary or
capricious, and did not violate the APA or NEPA.

## IV.  9B Regulations Claim (Count V)[28]

In 1978, pursuant to its Organic Act, the NPS promulgated
service-wide regulations covering non-federal oil and gas
operations within national parks (the "9B Regulations"), 36 C.F.R.
§§ 9.30-9.52. These regulations apply to all mineral rights that
must be accessed through national parks, including the Collier's
mineral estate under the Preserve.

---

[28] Count V is brought under the version of 36 C.F.R. Part 9B
that was in effect in May 2016. See AR 164218 (explaining that
NPS approved Burnett's Plan under the rules in effect at that
time). The 9B Regulations were updated effective December 5,
2016. See 81 Fed. Reg. 77,972; 77,972 (Nov. 4, 2016), but retain
the requirements at the core of plaintiffs' claim. See 36 C.F.R.
§§ 9.83(f), .85(c)(2), .105(a)(1), and .110(c).

Among other things, the 9B Regulations require operators to submit an extensive plan of operations that must be approved by NPS before extracting subsurface minerals. Relevant here, the 9B Regulations require all proposed oil and gas plans of operations to include, as appropriate, a description of "[a]ll reasonable technologically feasible alternative methods of operations, their costs, and their environmental effects." 36 C.F.R. § 9.36(a)(16)(v). The agency "shall not approve a plan of operations" that "does not satisfy each of the requirements of § 9.36 applicable to the operations proposed."[29] Id. § 9.37(a)(4). Park Service regulations also specify that the agency "shall not approve a plan of operations . . . [u]ntil the operator shows that the operations will be conducted in a manner which utilizes technologically feasible methods least damaging to the federally-owned or controlled lands, waters and resources of the unit while assuring the protection of public health and safety." 36 C.F.R. § 9.37(a)-(a)(1).

---

[29] The Superintendent of the Big Cypress National Preserve determines the information and materials which must be submitted that are pertinent to the type of operations proposed. This is the only information that is required to be submitted from Section 9.36(a)(1) through (18). See 36 C.F.R. § 9.36(c); see also 43 Fed. Reg. 57,822, 57,824 (Dec. 8, 1978) (9B Regulations Final Rule) (The 9B Regulations "are designed with flexibility so that not all the information identified in § 9.36(a)(1)-(18) may be required by the Superintendent to evaluate the impacts of the operations," and "[o]nly that information required for decisionmaking – information that is appropriate to the proposed operations – will be requested.").

In Count V, plaintiffs allege that the Plan did not contain any description of technologically feasible alternative methods of operations, their costs, or their environmental effects. Additionally, none of the NPS's NEPA documents contain any description of the costs associated with the Plan, or the costs of technologically feasible alternatives. Plaintiffs also believe that the Plan violated the 9B Regulations because it failed to evaluate numerous technologically feasible alternative survey methods that could be less damaging to Preserve resources, failed to evaluate more effective mitigation measures (such as requiring scientifically tested and verified techniques to more fully restore impacts to soils, vegetation, and hydrology, or requiring comprehensive wildlife, vegetation, and topographic surveys in advance of any of the activities).[30]

Here, Burnett identified the alternative explosives method in the Plan and other documents it provided (e.g., the draft EA), and provided a comparative analysis of how a survey using explosives would be conducted and its environmental effects. See, e.g., AR 003680-82, 000515-17 (drafts); see also AR 176915-17 (final EA). NPS found that the Plan satisfied 9B's regulatory requirements.

---

[30] Defendants assert that plaintiffs waived the 9B Regulations argument by failing to raise it with any specificity during the administrative process. Yet a review of the record shows that plaintiff raised the regulations during the administrative process. AR 057334-35; 057352; 057399-400.

AR 164200.  Burnett's Plan describes both of the reasonable and technologically feasible methods for adequately surveying Burnett's private mineral rights — shot-hole drilling and vibroseis.  And as discussed above, the Court has found that NPS took a "hard look" at viable alternatives to the Plan.  The Plan also describes the environmental effects of these methods, and outlines why vibroseis technology has fewer impacts than dynamite.  The Plan discusses costs and benefits of the two survey methods, explaining the efficiency of the vibroseis survey and comparative difficulty of shot-hole drilling.  AR 003700; 177012 (with a "greater amount of labor associated with drilling the holes, this alternative would take approximately twice as long . . . .").

With regard to cost of the Plan compared with other feasible alternatives, while Burnett did not provide a dollar figure for the expense of a survey using explosives or vibroseis, it did state that explosives method would require more vehicles, surveyors, and time, and would be more impacting.  AR 176915.  NPS personnel determined that the explosives alternative would be more costly than the proposed action.  See, e.g., AR 004671 ("From an economic point of view I understand the applicant's selection of vibroseis equipment that cost less to operate. . . An explosives survey would also contain added costs for the purchase of explosives, permits, licenses, explosives storage, explosive distribution by helicopter, and overall safety issues.").

Although plaintiffs argue that the approval of the Plan is not in accordance with the law because none of NPS's NEPA documents contain a description of the costs associated with the Plan, or the costs of the technologically feasible alternatives, the Court finds no requirement in the 9B Regulations that the cost information be contained in NEPA documents, must less specific dollar figures. See 30 C.F.R. § 9.36(a)(16)(v). Rather, the Regulations state that cost information may be requested by the Superintendent if it is appropriate to the proposed operations. Id. Apparently NPS was satisfied with the information Burnett provided because it stated in the FONSI that the Plan satisfied the 9B Regulations. AR 164200. This discussion of cost at AR 004671, while brief, is a reasonable conclusion reached by NPS based upon all of the information provided to NPS regarding the alternatives, and plaintiffs have provided the Court no authority for the proposition that cost figures are required by the 9B Regulations. "Courts 'will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Public Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)). "Absent evidence to the contrary, we presume that an agency has acted in accordance with its regulations." Sierra Club, 295 F.3d at 1223.

## V. The Three APA and ESA Claims (Counts VI-VIII)

In Counts VI through VIII, plaintiffs allege that NPS and FWS (the "Agencies") violated the ESA and the APA by obtaining an arbitrary and capricious Biological Assessment from the FWS and violating various independent duties under the ESA. (Doc. #40, ¶¶ 202-23.) Specifically, plaintiffs allege that the Agencies violated the ESA and APA during their consultations regarding Burnett's Plan in various ways (Count VI); failed to reinitiate consultation under the ESA regarding Burnett's Plan (Count VII); and failed to reinitiate consultation under the ESA regarding the Preserve Management Plans (Count VIII).

### A. Endangered Species Act and APA

The Endangered Species Act of 1973, 16 U.S.C. § 1531-44 (ESA), is described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978). The U.S. Fish and Wildlife Service (FWS) is the agency responsible for implementing the ESA. The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). "The plain intent of Congress in enacting this statute was to halt and reverse the trend

toward species extinction, whatever the cost." Tenn. Valley
Auth., 437 U.S. at 184.

Under certain circumstances, the ESA requires that a federal
agency consult with the appropriate expert agency. Section 7 and
its implementing regulations set out detailed consultation
procedures designed to provide agencies with expert advice to
determine the biological impacts of their proposed activities. 16
U.S.C. § 1536(b); 50 C.F.R. Part 402. In determining whether
formal consultation with the FWS is necessary, the federal agency
first prepares a Biological Assessment (done here) which evaluates
the potential effects of its proposed action on listed and proposed
species and designated and proposed critical habitat and
determines whether the species or habitat are likely to be
adversely affected by the action. 50 C.F.R. § 402.12(a). If the
Biological Assessment determines that an action "may affect" a
listed species or critical habitat, formal consultation is
required. If formal consultation is necessary, the FWS is then
responsible for formulating a "biological opinion as to whether
the action, taken together with cumulative effects, is likely to
jeopardize the continued existence of listed species or result in
the destruction or adverse modification of critical habitat." 50
C.F.R. § 402.14(g)(4).

The ESA prohibits the "taking" of any member of a listed
endangered or threatened species. "Take" is defined broadly as

"to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The ESA also directs federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy critical habitat. 16 U.S.C. § 1536(a)(2). When a federal agency has been advised that the proposed action will not jeopardize the continued existence of listed species but will result in the taking of some species incidental to that action, the FWS's biological opinion must include an incidental take statement specifying the amount or extent of anticipated take. If the FWS decides that no take is likely from the implementation of a proposed federal action, no incidental take statement is required in the biological opinion. See generally Defenders of Wildlife, 733 F.3d at 1111-13.

An agency's compliance with the ESA is reviewed under the deferential APA standard. Defenders of Wildlife v. Bureau of Ocean Energy Mgmt., 684 F.3d at 1248.

**B. Plaintiffs' Challenge on the Adequacy of the NPS's Consultation with FWS Regarding Burnett's Plan (Count VI)**

   **(1)  Unlawfully Narrow Action Area**

Plaintiffs allege that the Agencies analyzed an unlawfully narrow "action area,"[31] ignoring areas affected by the use of the off-site staging area and omitting a necessary buffer to account for Florida panther movements. (Doc. #94, p. 6-7; Doc. #40, ¶ 206.) Plaintiffs assert that the Agencies did not explicitly define the action area for Burnett's Plan, and their implicit definition of the action area omitted the off-site staging area and the areas of the Preserve impacted by travel to/from the staging area, which was arbitrary and capricious in violation of Section 7. In support, plaintiffs point to the 25-mile buffer zone used when NPS authorized primary ORV trails in the Addition GMP to reflect "the wide ranging movements of [panther] juveniles and the large home territories of adults" and include all lands that "may experience direct and indirect effects." AR 174095-96; 174170. Plaintiffs argue that the Agencies' failure to use a 25-mile buffer for Burnett's Plan arbitrarily and capriciously ignored habitats that will be affected directly and indirectly by Burnett's activities, including ORV use.

In response, NPS points out that although the overall survey area encompasses approximately 110 square miles, the data acquisition operations will be limited to an approximately 2.5

---

[31] The "action area" for Section 7 consultations includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

square mile area per day, which is very different from the Addition GMP.  FWS 004938.  Daily scouting of the survey lines will be conducted by a qualified ecologist to avoid potential impacts to wildlife.  FWS 004973 (biological assessment) FWS 006624-29 (FWS concurrence letter).  For purposes of this survey, NPS argues that FWS established species-specific buffer zones limiting daily survey activities, where appropriate, and nothing more is needed. See FWS 006625 (500-foot buffer for helicopter activity above active caracara nests and 500-foot buffer for helicopter activity around active Everglade snail kite nest); FWS 006626 (200-foot buffer for helicopter activity above red-cockaded woodpecker cavities; 200-foot buffer for foot or ORV traffic around red-cockaded woodpecker clusters; 500-foot buffer for helicopter activity above wood stork nests; and 328-foot buffer for foot or ORV traffic around wood stork nests); FWS 006626-27 (avoidance of Florida bonneted bat roost sites and buffer of 328-656 feet around Florida panther den sites).

Plaintiffs previously questioned the scope of the action area used by FWS for purposes of its ESA analysis, FWS 007011, and in response FWS reaffirmed it's "not likely to adversely affect" determination concerning potential effects of the Burnett survey. FWS 007019.  FWS explained that "[b]ased on the proposed conservation measures and the temporary nature of the seismic survey and associated impacts (i.e., one-pass design, 18-week

project duration), the Service agreed with the NPS determination that any adverse effects to listed species were insignificant or discountable." FWS 007018.

Deference to an agency's decision regarding the determination of an appropriate action area is recognized and in order for the Court to find that the Agencies' decision was arbitrary and capricious, the Court must find that "a clear error in judgment" was committed. See North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538 (11th Cir. 1990). In challenging a decision by other agencies, plaintiff "bears a difficult burden in providing [NPS] was arbitrary and capricious in relying on these decisions, which were entirely within those agencies' areas of expertise." Sierra Club, 295 F.3d at 1222.

As noted above, an "action area" for purposes of the ESA is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. Here, the Agencies considered the wildlife effects of the survey without regard to where wildlife is located. Neither the NPS nor the FWS limited its analysis to any defined action area. The BA discussed the effects of vehicle and helicopter traffic in general, not just effects in a specific location. See FWS 000470 ("[I]mpact to wildlife in and around the survey area resulting from helicopter operations is anticipated to be minimal and limited to temporary avoidance behavior."); FWS

004970 (avoidance is "expected to be no different than that resulting from other ongoing helicopter and fixed-wing aviation operations in and around the survey area"); FWS 006833 (monitoring of radio-instrumented panthers in and around the survey area); see also FWS 004972 (considering impact of vibroseis buggy "in and around" the area); FWS 004991 (monitoring of panthers "in and around" the area). In addition, the off-site staging area was moved out of the Preserve at plaintiffs' request, and once Burnett moved the staging areas out of the Preserve to the Vulcan Mine site, the Agencies assessed the potential effects associated with using the limestone mine to store equipment. See, e.g., AR 000030-32, 176910-11; FWS 005237-38 (considering impact of helicopter usage "between the staging area outside of the park to the site"). NPS concluded, and FWS concurred, that moving the staging areas offsite would result in "lesser environmental impact" and "lesser impacts to listed species." FWS 006946; 006999. This was not arbitrary or capricious.

With regard to plaintiffs' argument that the failure to include a 25-mile buffer zone as applied in the Addition GMP was arbitrary and capricious, the Agencies did consider the Addition GMP. Although the FONSI did state that the anticipated adverse impacts would be similar to impacts from recreational ORVS analyzed in the 2010 Addition GMP/EIS, the Agencies considered the mitigation measures present in the EA here and noted that impacts

would be minimized and limited. AR 164195. The recreational ORV use addressed in the management plans involved repeated passes over the same locations (which causes greater impact), whereas Burnett designed its survey to minimize the number of times that vehicle cross the same location (the "one pass" survey design), AR 177032, and Burnett's survey incorporates environmentally-protective measures that are not required for general recreational ORV activities.

The record establishes that the Agencies examined the environmental impact to the eleven federally-listed or candidate species within the survey area and designated appropriate "action areas" and buffer zones based upon the FWS's specialized knowledge of the species' activities and responses to any activity within the area. AR 176975-80. The Court finds no violation of the APA or the ESA.

**(2) Direct and Indirect Impacts to Listed Species**

Plaintiffs next argue that the BA failed to fully "evaluate the potential effects of the action on listed and proposed species," 50 C.F.R. § 402.12(a), including all "direct and indirect effects," id. § 402.02 (definition of "[e]ffects of the action"), outside the Phase I survey area. Specifically, plaintiffs point to effects of helicopter flights on wildlife, arguing that the FWS ignored helicopter effects on Florida panthers entirely, and assumed that wood storks would be buffered from helicopter

activities, even though scouting to establish wildlife buffers will not occur outside of the Phase I survey area. AR 004588-89. Plaintiffs also point to the effects from traffic on State Road 29 between the off-site staging area and the Phase I survey area that FWS ignored, citing the risk of vehicle collisions for the Florida panther when fleeing from Burnett's activities. AR 174103 (2010 Addition GMP Biological Opinion); 174153-56; 174172; 176912. Plaintiffs also believe that the Agencies ignored and failed to consider indirect effects of interspecies aggression on the Florida panther that may be triggered if Burnett's activities drive a panther into another panther's territory. All of these arguments assert that the Agencies overlooked indirect effects that may result from the relocation of the staging area to the Vulcan Mine site.

FWS and NPS were aware that Burnett relocated and consolidated the five staging areas to Vulcan Mine property outside the Preserve, as described in the revised EA dated March, 2016. FWS 006766 (revised EA); FWS 006946 (request for concurrence). By email dated April 12, 2016, FWS affirmed that this change does not affect FWS's prior concurrence that the planned operations are not likely to adversely affect threatened or endangered species. FWS 006999. FWS agreed with the NPS's conclusion in its March 25, 2016 letter that using offsite staging areas would result in effects to listed species "less severe than the effects of vehicles

traveling within the Preserve to and/or between the five previously proposed staging areas." FWS 006946.

The Court finds that the Agencies' decision was not arbitrary or capricious. NPS considered a literature survey on the effects of noise on wildlife, AR 171957, to support its conclusion in the BA that "the direct impact to wildlife in and around the Survey Area resulting from helicopter operations is anticipated to be minimal and limited to temporary avoidance behavior." AR 179714. NPS reasoned that the environmental and operational benefits of helicopter use would "more than offset any wildlife avoidance behavior that may result from their use when operated in compliance with applicable USDO-NPS regulations, stipulations, and recommendations." Id. And FWS concurred that the planned operations are "not likely to adversely affect" any of the ESA-listed species based in part on species-specific helicopter buffer areas for certain species. Such choice of studies and determination lie in the Agencies' area of expertise, which is entitled to deference. Sierra Club, 295 F.3d at 1222.

And the Court agrees with Burnett's point that cars and trucks traveling to Vulcan Mine will drive on existing highways (I-75 and State Road 29), and will present no impacts different than the thousands of cars passing over those roads every day. Plaintiff has failed to persuade the Court that any additional studies are needed to assess this impact.

**(3)  Cumulative Impacts on Listed Species**

Plaintiffs next argue that the NPS's BA for Burnett's Plan purported to consider cumulative effects but ignored all activities outside the Preserve, which was arbitrary and capricious and an unexplained departure from past FWS evaluations, citing AR 179721-40; 095340-42; 169901-03; 174133-35.  Plaintiffs cite a 161-square-mile seismic survey by Tocala, LLC located 3.7 miles north of the Burnett survey area, which plaintiffs believe is reasonably certain to occur because Tocala, LLC has a state permit and approval from the FWS.  AR 004984; 004995; 005008-10; 084593; 095342; 095342; FWS 004054-58.  Plaintiffs state that the Tocala survey will be within the 25-mile buffer for Florida panthers that should be part of the action area for Burnett's Plan.

Defendants inform the Court that the Tocala survey, which will use explosives as the seismic vibration source, is outside the Preserve on private lands in Collier and Hendry Counties, Florida, which is outside any of the action areas for the Plan. They argue that the Tocala survey was not analyzed as part of "cumulative effects" because it involved a past Federal activity by the Corps of Engineers, rather than a future State or private activity.

For purposes of the ESA, "cumulative effects" is defined as "those effects of future State or private activities, not involving Federal activities that are reasonably certain to occur within the

action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. The record shows that FWS was aware of this survey because it consulted with the U.S. Army Corps of Engineers in 2014 and concluded that the Tocala survey was not likely to adversely affect several threatened and endangered species. FWS 004055-57. See Miccosukee Tribe, 566 F.3d at 1269 (state and private projects fell "within the jurisdiction of the Army Corps of Engineers" and were exempt from cumulative impacts analysis because they are subject to their own consultation process). In any event, failure to consider the Tocala survey which was outside any of the actions areas determined to be proper by the Agencies was not arbitrary or capricious, as discussed supra, Sec. V.B(1).[32]

**(4) Use of the Best Scientific and Commercial Data Available**

Plaintiffs assert that the Agencies failed to "use the best scientific and commercial data available" for wood storks and red-cockaded woodpeckers, in violation of 16 U.S.C. § 1536(a)(2). Specifically, plaintiffs argue that the Agencies the BA did not include the latest bird maps showing the locations of wood storks

---

[32] Although not argued in their motion for summary judgment, plaintiffs assert in their Amended Complaint (Doc. #40) that the Agencies also failed to consider all cumulative effects of future phases of Burnett's exploration on listed species. (Doc. #40, ¶ 206.) As previously discussed with regard to the NEPA claims, the Court finds that there is not enough evidence that the next three phases will occur to justify the further assessment of their environmental impact. In any event, any future seismic surveys would be subject to its own federal review.

and red-cockaded woodpeckers in the survey area, thereby ignoring better available data concerning the birds. "The general view is that the agency decides which data and studies are the 'best available' because that decision is itself a scientific determination deserving deference." Miccosukee Tribe, 566 F.3d at 1265 (citing Marsh, 490 U.S. at 377–78).

Although Burnett did not have the sufficient geographic information system ("GIS") data for purposes of including certain known wood stork rookeries in the BA, the BA and the FWS concurrence letter both assumed that wood storks and red-cockaded woodpeckers are present in the survey area and expressly considered the survey's potential effects on them and included buffer zones for their protection. FWS 004984-88; 006625-26; AR 005012; FWS 006672 (maps showing red-cockaded woodpeckers in the survey area). The Agencies considered the whole record, not just the BA, when finding no significant impact.

Therefore, contrary to plaintiffs' assertions, the Agencies did not ignore available biological information about the wood storks and red-cockaded woodpeckers, but did consider them and incorporated measures for their protection in the BA. FWS 006625-27. Moreover, FWS's "not likely to adversely affect" determination assumes the presence of these species in the project area and requires further surveys by trained ecologists prior to daily seismic operations so that the species can be avoided. FWS

AR 006626.  Plaintiffs have not demonstrated that this violates Section 7 of the ESA.

### (5)  Mitigation Measures

As argued earlier in the NEPA context, plaintiffs assert that the mitigation measures considered by the Agencies are not reasonably certain to occur or to be effective, and are unenforceable, vague, or discretionary because they apply only if "practicable" or "feasible," or specify that impacts will be "avoided," but not prohibited in violation of the ESA.  See AR 004591; 164184-89.

Burnett's Plan includes daily scouting of survey lines, establishment of species specific buffer zones, and other procedures to avoid and mitigate for potential disturbance to ESA-listed species.  Based on the planned implementation of these procedures, FWS agreed that any adverse effects on listed species would be minimized.  FWS 006629-30.  See also AR 179740 (BA).  All of the stipulations identified in the minimization and mitigation measures described in the FONSI, AR 164179-282, are incorporated as mandatory components of NPS's conditional approval letter dated May 10, 2016, which approved the Plan pursuant to 36 C.F.R. § 9.37(b)(2).  AR 179894.

An agency's expert determinations such as the appropriate mitigation measures to protect endangered species are owed exceeding deference.  See Nat'l Parks Conservation Ass'n, 835 F.3d

at 1384. Here, many of the mitigation measures were developed by NPS during the development of the 1992 GMP/EIS for the original Preserve, and the Mineral Management Plan attached to the GMP/EIS, and thus have already been subject to analysis. E.g., AR 176897 (incorporating mitigation measures identified in 1992 GMP/EIS). See 40 C.F.R. § 1502.20 ("Whenever a broad environmental impact statement has been prepared ... and a subsequent ... environmental assessment is then prepared on an action included within the entire program ... the subsequent ... environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference...."). Likewise, NPS had the experience from many of the mitigation measures used during and after the 1999 Raccoon Point Seismic Survey. See AR 174937 (describing the successful "restoration of ruts and vehicle tracks resulting from seismic operations to original contour conditions"). Thus, the effectiveness of the mitigation measures has been assessed in other contexts allowing NPS to make an informed judgment about the proper mitigation measures to implement. The Court affords this decision deference and does not find it arbitrary or capricious. Plaintiffs' "belief" that these mitigation measures will not work is not supported by any evidence in the record.

**C. Reinitiate Consultation re: Vulcan Mine Site (Count VII)**

Plaintiffs assert that NPS was required to reinitiate consultation with FWS to evaluate the effects of relocating the staging area to Vulcan Mine, arguing that the change expanded the action area and affects listed species in ways the Agencies did not consider.  And plaintiffs believe that even if the Agencies speculate that the change is "more protective," the Agencies must reinitiate consultation because the revised Plan has "the potential for different effects on species" than the original, citing <u>Nat'l Parks Cons. Ass'n v. Jewell</u>, 62 F. Supp. 3d 7, 17 (D.D.C. 2014).  Plaintiffs argue that the FWS's concurrence letter did not indicate that it considered the new, additional effects of the off-site staging area on listed species.  <u>See</u> AR 095040; FWS 006999.

Reinitiation of consultation is required if new information reveals, or a project modification causes, effects that were not considered.  50 C.F.R. § 402.16(b)(c).  Plaintiffs' argument fails.  Moving the staging area to the Vulcan Mine site was done specifically in response to plaintiffs' concerns about the five staging area locations in the Preserve and altered the Plan in such a way to minimize the environmental impact.

In any event, the record shows that the Agencies did reinitiate consultation.  After Burnett identified the Vulcan Mine as a new location for staging equipment, the NPS prepared a revised EA pursuant to NEPA that addressed the effect of that change.  NPS

transmitted its revised EA to FWS and requested concurrence confirmation concerning FWS's previous ESA-related determinations. FWS 007000; 006743-945. By email dated April 12, 2016, FWS confirmed that the change in staging area did not affect the previous concurrence. FWS 006999. And to the extent plaintiffs argue that the change to an off-site staging area altered the "action area" for the Plan that were not considered, the Court has already addressed that argument, <u>supra</u> V.B(1). The Court finds no violation of the ESA or NEPA.

## D. Reinitiate Consultation re: the Preserve Management Plans, Florida Bonneted Bat (Count VIII)

In Count VIII, plaintiffs assert that the Agencies failure to reinitiate consultation on the 1992 Preserve GMP, the 2000 ORV Management Plan, and the 2010 Addition GMP/EIS (the "Preserve Management Plans") after the Florida bonneted bat was listed as endangered in 2013 violates the ESA. The Agencies must reinitiate formal consultation "where discretionary Federal involvement or control over the action has been retained or is authorized by law and . . . [i]f a new species is listed . . . that may be affected." 50 C.F.R. § 402.16(d). The NPS retains "discretionary involvement or control" over the Preserve Management Plans and the FWS's bat consultation area includes the entire Preserve. AR 179781; 177011. The NPS prepares and revises general management plans for all NPS units, and may do so at any time. 54 U.S.C. § 100502; AR

178335.  By failing to reinitiate consultation, plaintiffs argue, the Agencies imperil their interests in the Florida bonneted bat because the Agencies have not considered how the activities authorized by the Preserve Management Plans may affect the bat.

Defendants respond that plaintiffs have not shown standing to pursue this claim, nor have they shown that the claim is ripe for review.  In addition, defendants argue that plaintiffs' claim fails on the merits.

**(1)  Standing**

The federal defendants argue that plaintiffs lack standing to challenge the Preserve Management Plans because plaintiffs fail to demonstrate that their purported interests in the Florida bonneted bat will be injured due to any of the agency actions at issue in this case under the revised EA for the Burnett survey.  Plaintiffs argue that they have standing because the Agencies caused plaintiffs a "procedural injury" by violating their ESA duty to reinitiate formal consultation on the Preserve Management Plans.

"In order to invoke federal-court jurisdiction, a plaintiff must demonstrate that he possesses a legally cognizable interest, or 'personal stake,' in the outcome of the action.  This requirement ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved."  <u>Genesis Healthcare v.</u>

<u>Symczyk</u>, 133 S. Ct. 1523, 1528 (2013) (internal citations omitted). For constitutional standing, "plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 134 S. Ct. 1377, 1386 (2014) (citing <u>Lujan</u>, 504 U.S. at 560). The party invoking federal jurisdiction bears the burden of establishing these three elements. <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1547 (2016).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1547 (2016) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)).

Most recently, the Supreme Court addressed the injury in fact element in <u>Spokeo v. Robins</u>. In <u>Spokeo</u>, the plaintiff filed a class-action complaint, alleging certain procedural violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 <u>et seq.</u>, against an online "people search engine" operator accused of creating inaccurate consumer reports. 136 S. Ct. at 1544. The Supreme Court noted that a "concrete injury" "must be 'de facto'; that is, it must actually exist." <u>Id.</u> at 1548. But the Supreme Court

recognized that "concrete" does not necessarily mean "tangible," and "intangible injuries can nevertheless be concrete." _Id._ "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." _Id._ The Supreme Court further recognized that a plaintiff does not automatically satisfy the injury-in-fact requirement "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." _Id._ at 1549. For example, a plaintiff could not allege a "bare procedural violation" absent harm and satisfy the injury-in-fact requirement.[33] _Id._ Yet this does not mean that the risk of real harm cannot satisfy the requirement of concreteness. _Id._ at 1549. "[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified." _Id._

As a general matter, "[r]edressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." _Fla. Wildlife Fed'n, Inc. v. South Fla. Water Mgmt. Dist._, 647 F.3d 1296, 1303-04 (11th Cir.

---

[33] The _Spokeo_ court cited an agency's dissemination of a wrong consumer zip code as an example of a statutory violation for which the FCRA purports to provide redress, but which likely causes harm too "abstract" to confer standing. 136 S. Ct. at 1550.

2011) (quoting <u>Mulhall v. Unite Here Local 355</u>, 618 F.3d 1279, 1290 (11th Cir. 2010)). "The fairly traceable element explores the causal connection between the challenged conduct and the alleged harm." <u>Loggerhead Turtle v. County Council of Volusia County, Fla.</u>, 148 F.3d 1231, 1247 (11th Cir. 1998) (citation omitted).

In support of standing, plaintiffs filed the Second Declarations of John Adornato III (Doc. #94-1) and Matthew Schwartz (Doc. #94-2) ("Declarants"), both members of plaintiff-environmental organizations who are concerned about the Plan's impact on the Florida bonneted bat because it could harm or deter bats from roosting or feeding nearby.[34] With regard to injury in fact, the federal defendants argue that the declarations do not specify a specific, imminent injury. In particular, defendants argue that plaintiffs only challenge the failure to reinitiate consultation rather than any particular action that would directly injure the Declarants, and any alleged injuries are based purely on conjecture as to potential adverse effects of the planned survey

---

[34] The federal defendants suggest that the Court can consider the declarations filed by plaintiffs concerning standing at the summary judgment stage. (Doc. #100, p. 21.) Although the Court agrees it can consider the declarations, subject matter jurisdiction is not a decision on the merits, and is resolved as a motion to dismiss, not summary judgment. <u>Aqua Log, Inc. v. Lost and Abandoned Pre-Cut Logs and Raft of Logs</u>, 709 F.3d 1055, 1058 (11th Cir. 2013); <u>Goodman v. Sipos</u>, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001).

on the bat. Defendants believe that because plaintiffs have not demonstrated an injury in fact, the corresponding elements of causation and redressability are also not satisfied.

Both of plaintiffs' Declarations state that the Declarants are interested in the Florida bonneted bats and visit the Preserve in hopes of seeing one. The Schwartz declaration further states that he would like to go with researchers to observe Florida bonneted bat roosting sites in the Preserve. (Doc. #94-2, ¶ 6.) Yet these Declarations do not demonstrate (and plaintiffs have not otherwise shown) that the Declarants' purported interest in the Florida bonneted bat will be imminently injured due to any of the agency's actions in this case. See Lujan, 504 U.S. at 565 ("And the affiants' profession of an 'inten[t]' to return to the places they had visited before — where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species — is simply not enough. Such 'some day' intentions — without any description of concrete plans, or indeed even any specification of when the some day will be — do not support a finding of the "actual or imminent" injury that our cases require."); cf Black Warrior Riverkeeper v. U.S. Army Corps of Engineers, 781 F.3d 1271, 1280 (11th Cir. 2015) (finding that "[v]oluminous record evidence indicates that Riverkeeper's members have suffered harm to their aesthetic and recreational interests"). Here, the alleged injuries, while arguably

"particularized", fall short of establishing that they are concrete.

The standing principles announced in Spokeo do not compel a different results. In Lujan, the Supreme Court addressed the argument as to whether an individual has standing because they suffered a "procedural injury." 504 U.S. at 572. The so-called "citizen-suit" provision of the ESA provides, in pertinent part, that "any person may commence a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter." 16 U.S.C. § 1540(g). The Lujan court rejected the view that all persons have an abstract, self-contained, noninstrumental "right to have the Executive observe the procedures required by the ESA. Id. at 573. This is in line with Spokeo, wherein the court there found that a plaintiff does not automatically satisfy the injury-in-fact requirement "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." 136 S. Ct. at 1549. There must be some concrete harm separate from their statutorily-granted right to sue. The Court finds that a concrete harm has not been established in this case within the meaning of Lujan. The ESA's procedural requirements affording a right to sue were not designed to protect any concrete

interest afforded to a specific class of persons sufficient to confer standing.

**(2) Ripeness**

The federal defendants also assert that the Court lacks jurisdiction over plaintiffs' claims because the claims are not ripe because plaintiffs have not demonstrated that they will be injured by NPS's alleged failure to reinitiate consultation regarding the Preserve Management Plans. "Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 670 n. 2 (2010) (citation omitted); Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003). To determine whether a claim is ripe for judicial review, courts consider both "the fitness of the issues for judicial decision" and "the hardship of withholding court consideration." Stolt–Nielsen S.A., 559 U.S. at 670 n. 2; National Park Hospitality Ass'n, 538 U.S. at 808. Courts consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998). In the administrative

context, ripeness is a justiciability doctrine designed to prevent the courts from entangling themselves in abstract disagreements over administrative policies and to shield agencies from judicial interaction until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, 727 F.3d 1349, 1356 (11th Cir. 2013) (citations omitted). Generally, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (internal citation omitted).

Here, the claim is undoubtedly ripe. The NPS has issued a final decision which plaintiffs alleges runs afoul of federal law. Indeed, work has already begun to implement Burnett's Plan.

**(3)  Obligation to Reinitiate Consultation**

Even if the Court assumes that plaintiffs have standing to pursue Count VIII, the federal defendants argue that plaintiffs nevertheless fail to demonstrate that NPS had a legal obligation to reinitiate consultation on the Preserve Management Plans. The Court agrees.

Resource management plans generally do not constitute "agency action" requiring ESA consultation under Section 7. See Forest Guardians v. Forsgren, 478 F.3d 1149, 1158 (10th Cir. 2007). Forsgren reasoned that "[s]pecific activities, programs, and/or

projects are necessary to implement the plan." Id. at 1158. Under the ESA, there is an obligation to consult over agency "action." 16 U.S.C. § 1536(a)(2). The term "action" is defined by regulation as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. Consultation is reinitiated only where "discretionary Federal involvement or control over the action has been retained or is authorized by law." 50 C.F.R. § 402.16.

The management plans are not "actions" subject to consultation. The bats are protected from future potential threats by the application of ESA to any future actions. There is no pending agency action related to the Preserve Management Plans that would trigger a duty to reinitiate ESA consultation. Here, the Minerals Management Plan and the NPS's regulations provide that future oil and gas exploration and development projects must be subject to site-specific reviews. AR 1167332 and 36 C.F.R. § 9B. As required, NPS's decision was informed by a site-specific ESA consultation that addressed potential effects on ESA-listed species, including the Florida bonneted bat. FWS established species-specific buffer zones limiting daily survey activities, where appropriate. See FWS 006627 (avoidance of Florida bonneted bat roost sites). The Court finds no obligation to reinitiate consultation.

The Court has found that defendants complied with NEPA, the APA, and the ESA. The Court denies the request for a preliminary (Doc. #36) and a permanent injunction.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. Plaintiffs' Motion for Preliminary Injunction (Doc. #36) is **DENIED.**

2. Plaintiffs' Motion for Summary Judgment (Doc. #94) is **DENIED.**

3. Federal Defendants' Combined Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment (Doc. #100) is **GRANTED.** Judgment is granted in favor of defendants on all counts. Alternatively as to Count VIII, Count VIII is dismissed without prejudice for lack of constitutional standing.

4. Defendant-Intervenors' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment (Doc. #102) is **GRANTED**.

5. The National Park Services' Finding of No Significant Impact is **AFFIRMED.**

6. The Clerk shall enter judgment accordingly, terminate any pending deadlines and close the file.

7.    The Federal Defendants' Motion to Strike (Doc. #106)[35] is **DENIED AS MOOT.**

8.    Plaintiffs' Motion for Injunction Pending Appeal (Doc. #112) is **DENIED AS MOOT** in light of this Opinion and Order.

**DONE and ORDERED** at Fort Myers, Florida, this ___24th___ day of April, 2017.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record

---

[35] The motion to strike requests that the Court strike plaintiffs' argument that FWS 007017-21 is not properly in the administrative record.  This document is a clarification of FWS's decision and was drafted after the Agencies received plaintiffs' 60-day notice of intent to sue.  Because the Court did not rely on this document in support of its decision, it does not reach the issue of whether it should be stricken.